# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TEAMSTERS LOCAL 237 ADDITIONAL SECURITY BENEFIT FUND, TEAMSTERS LOCAL 237 SUPPLEMENTAL FUND FOR HOUSING AUTHORITY EMPLOYEES, and ALAN WATERHOUSE, <br><br> Plaintiffs, <br><br> v. <br><br> DAN CARUSO, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 2020-0620-PAF |

## MEMORANDUM OPINION

Date Submitted: May 19, 2021
Date Decided: August 31, 2021

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen, Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Randall J. Baron, David Wissbroecker, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; *Attorneys for Plaintiffs.*

Edward B. Micheletti, Cliff C. Gardner, Veronica B. Bartholomew, Gregory P. Ranzini, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Defendant.*

The plaintiffs are former stockholders of Zayo Group Holdings, Inc. ("Zayo" or the "Company"). On March 9, 2020, a consortium of equity co-investors acquired the Company (the "Merger") under an agreement and plan of merger dated May 8, 2019 (the "Merger Agreement"). The total transaction value was approximately $14.3 billion. In the Merger, each share of Zayo common stock was converted into the right to receive $35 in cash. During the sale process, defendant Dan Caruso served as the Company's Chief Executive Officer and Chairman of the Board. The plaintiffs contend that Caruso, under threat of removal by activist stockholders, breached his fiduciary duty by steering the sale process toward the acquiror so that he could capture the future upside of the business through a rollover of his stock and remaining as CEO post-merger. Plaintiffs further allege that, despite being aware of Caruso's conflicts, the Zayo board did not sufficiently oversee and manage Caruso's conduct to maximize stockholder value. Plaintiffs also assert that Caruso is personally liable for materially misleading disclosures and omissions in the proxy statement disseminated to Zayo stockholders recommending that they approve the Merger (the "Proxy").

Caruso has moved to dismiss, contending that the Complaint lacks sufficient allegations to state a claim. He contends that the involvement of an informed and engaged board of directors defeats any claim for liability arising from the Merger. He maintains that the Zayo board of directors (the "Board") was independent, well

aware of Caruso's potential conflicts, and managed them in accordance with their fiduciary duties. Defendant further argues that the Merger was ratified under *Corwin*[1] by a fully-informed, uncoerced stockholder vote.

The allegations of the Complaint do not support a reasonable inference that the Merger is subject to entire fairness review or that Caruso breached his fiduciary duties by corrupting the sale process. Plaintiffs have alleged facts creating a pleadings-stage inference that Caruso was subject to a conflict of interest because he knew from the outset that the ultimately successful bidder required that Caruso remain as CEO post-closing. Though Caruso was subject to a conflict of interest, that is not fatal to his motion to dismiss. The Complaint lacks allegations supporting a reasonable inference that Zayo's Board did not act in a manner reasonably designed to manage the conflict or maximize value. It lacks well-pleaded allegations supporting a reasonable inference that Caruso disabled the Board by failing to inform it about critical events or by acting unilaterally without the Board's knowledge.

Plaintiffs have identified a discussion between Caruso and the acquiror's representative that was not disclosed in the Proxy, even though the Proxy discloses other, similar communications between them regarding the Merger price. It is reasonably conceivable that this omission was material in light of the related

---

[1] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 308 (Del. 2015) (holding that an "uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger").

disclosures. Accordingly, I conclude that the Complaint pleads facts from which it is reasonably conceivable that Caruso could be determined to be liable for a breach of the duty of care in his capacity as an officer for his involvement in the preparation of the Proxy.

## I. FACTUAL BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Verified Complaint (the "Complaint" or "Compl.") and documents integral thereto, including documents produced to Plaintiffs in response to books and records demands under 8 *Del. C.* § 220.[2]

### A. The Parties

Zayo is a global provider of communications infrastructure, with operations in the United States, Canada, and Europe.[3] "Zayo owns and operates extensive fiber networks, data centers, and small cell cites used for 5G networks."[4] Zayo is a Delaware corporation based in Boulder, Colorado, and is Boulder's largest local private employer.[5]

---

[2] The parties agreed that the documents produced to Plaintiffs in response to the § 220 demands are incorporated by reference into the Complaint. Def.'s Opening Br. 30 n.10; *id.* Ex. 3, ¶ 2(e). Defendant attached various documents as exhibits to Defendant's Opening Brief, and they will be cited as "Ex." In addition, the Complaint incorporates by reference the Proxy. The Proxy is attached as Exhibit 1 to Defendant's Opening Brief.

[3] Compl. ¶ 25.

[4] *Id.*

[5] Proxy at 1; Compl. ¶¶ 2, 5.

3

Zayo's business consisted of a large mix of assets and products as a result of numerous acquisitions.[6] Zayo divided its product groups into five primary operating segments: Fiber Solutions, Transport, Enterprise Networks, Colocation (or "zColo"), and Allstream.[7] Zayo conducted internal valuations on a sum-of-the-parts basis and reported on each segment separately in its filings with the U.S. Securities and Exchange Commission (the "SEC").[8] Zayo management believed that the market undervalued Zayo because of its "mix of idiosyncratic assets."[9]

Defendant Dan Caruso cofounded Zayo in 2007 and served as its Chief Executive Officer and Chairman of the Board since the Company's formation.[10] Zayo went public in 2014, and as of 2018, Caruso beneficially owned 3.6% of Zayo's outstanding common stock.[11] The other members of Zayo's nine-person Board at the time of the Merger were non-parties Donald Gibs, Linda Rottenberg, Steven Kaplan, Emily White, Scott Drake, Yancey Spruill, Rick Connor, and Cathy Morris.[12] Caruso was actively involved in the Boulder community and was a

---

[6] Compl. ¶ 29.

[7] Id. ¶ 31; see also id. ¶¶ 32–36 (describing each business segment).

[8] Id. ¶¶ 31, 39.

[9] Id. ¶ 39.

[10] Id. ¶ 14.

[11] Id. ¶ 15. As of June 21, 2019, Caruso beneficially owned 3.1% of Zayo's outstanding common stock. Proxy at 116.

[12] Compl. ¶¶ 16–23; Proxy at 116. The Complaint does not identify Connor or Morris by name.

prominent figure in Boulder's start-up scene.[13]  As will be discussed below, Caruso's professional and social circles intersected to varying degrees with those of other Board members.  Of Zayo's nine directors, Caruso is the only Zayo employee and the only named Defendant in this action.

Plaintiffs: Teamsters Local 237 Additional Security Benefit Fund, the Teamsters Local 237 Supplemental Fund for Housing Authority Employees, and Alan Waterhouse (collectively, "Plaintiffs") were beneficial owners of shares of Zayo common stock at all relevant times.[14]

### B. The Initial Approach

In July 2018, Marc Ganzi, CEO of Digital Colony Partners, L.P. (with its affiliates, "Digital Colony"), contacted Caruso to "pitch" a "crazy idea."[15]  Ganzi and Caruso met later that month at Ganzi's vacation home in Colorado and then again on August 7 at Caruso's home.[16]  In an email after their August meeting, Ganzi highlighted a previous collaboration between Zayo and a Digital Colony portfolio company, telling Caruso, "I would like to find more ways for us to work together Dan.  I think we could do great things."[17]  He encouraged Caruso to "think bigger .

---

[13] Compl. ¶ 16.

[14] *Id.* ¶ 13.

[15] *Id.* ¶ 41.

[16] *Id.* ¶¶ 41, 42.

[17] Ex. 4.

. . . A storm is coming, and I think if properly positioned you can be the biggest winner of all."[18]  Caruso and Ganzi met again on September 14, 2018 where Ganzi told Caruso: "I think I have my idea fully mapped out now. . . . I will come back to you in writing."[19]  The Complaint alleges that Caruso did not immediately disclose Ganzi's interest to the Board in a "mid-September update."[20]  Caruso did disclose Ganzi's interest in acquiring the Company to the Board no later than October 2018.[21]

On August 22, 2018, Zayo reported disappointing earnings and a decline in the Company's stock price soon followed.[22]  Two days earlier, Zayo's Strategy Committee (consisting of Gips, Rottenberg, and White) discussed increased activist engagement and an "uptick in interest" from Elliott Management Corporation ("Elliott"), a well-known hedge fund and activist investor.[23]  The committee discussed the Company's expectation that activist pressure would increase if the

---

[18] Compl. ¶ 42; Ex. 4.

[19] Compl. ¶ 44.

[20] *Id.* ¶ 45.

[21] Ex. 9.  Caruso's disclosure to the Board in an October 19, 2018 email implies that he had previously informed them of Ganzi's interest, but does not specify when.  *Id.* ("Recall that Marc Ganzi of Digital Bridge approached me in the recent past re: taking Zayo private."). In a paragraph recounting the August 2018 meeting between Ganzi and Caruso, the Proxy states that "Caruso notified the board of directors of the contents of this conversation during his normal updates to the board of directors on corporate development activities."  Proxy at 27.

[22] Compl. ¶ 50.

[23] *Id.* ¶ 48; *see also id.* ¶ 71 (listing the members of the Strategy Committee).

Company failed to meet expected revenue and earnings growth, if the Company did not monetize Allstream, or if the Company's communications about its strategic initiatives became "murky."[24] In that same month, Caruso and Matt Steinfort, Zayo's Chief Financial Officer, were evaluating the possibility of a management buyout.[25] On August 28, 2018, Steinfort informed a strategic counterparty interested in acquiring the Allstream business segment that "we had discussed a management buyout and that it had gained traction internally for a number of reasons and we were likely to head down that path."[26] In late September, Caruso and Steinfort arranged meetings with Zayo's financial advisors, Goldman Sachs & Co. LLC ("GS") and J.P. Morgan Securities LLC ("JPM").[27] On October 4, JPM sent leveraged-buyout discussion materials to Caruso and Steinfort, which contemplated a $46 buyout price.[28] Caruso did not send JPM's presentation to the Board.[29]

On October 16, 2018, Caruso received a letter from Zimmer Partners, which owned a significant number of Zayo shares.[30] The letter told Caruso that Zimmer Partners had spoken with many other Zayo investors who had "lost faith in your

---

[24] *Id.* ¶ 49.

[25] *Id.* ¶ 43. This evaluation continued through October. *Id.* ¶¶ 43–47.

[26] *Id.* ¶ 43.

[27] *Id.* ¶ 46.

[28] *Id.*

[29] *Id.*

[30] *Id.* ¶ 52.

ability to execute" and that "mutual fund and hedge fund investors are voting against your performance and are showing a disturbing lack of confidence in management."[31] The Strategy Committee acknowledged the letter at its November 5 meeting, and noted that "[i]nvestor angst is on the rise."[32] In a letter in January 2019, Zimmer made clear that it was not an activist investor.[33]

Zayo's stockholders expressed wide support for Caruso and his leadership, despite any rumblings from activists. At the 2018 annual stockholders meeting held on November 6, Zayo stockholders re-elected Caruso, Gips, and Drake to three-year terms. Caruso received 197,766,808 votes in favor of re-election and there were 5,671,177 withheld votes.[34] Stockholders also approved a board proposal to amend the Company's certificate of incorporation to eliminate Zayo's classified board structure and to amend the certificate and bylaws to eliminate supermajority voting requirements to amend the certificate and bylaws.[35] Under those amendments, the

---

[31] Compl. ¶ 52 (alterations omitted).

[32] *Id.* ¶ 53.

[33] Ex. 27.1.

[34] Zayo Group Holdings, Inc., Current Report (Form 8-K) (November 6, 2018). The court can take judicial notice of these results. DEL. R. EVID. 201; *see In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (holding that a court may take judicial notice of documents publicly filed with federal agencies, such as the SEC). The advisory resolution to executive compensation was approved by a margin of better than 2 to 1. Zayo Group Holdings, Inc., Current Report (Form 8-K) (November 6, 2018). If broker non-votes are eliminated, the margin was better than 3 to 1. *Id.*

[35] Zayo Group Holdings, Inc., Current Report (Form 8-K) (November 6, 2018).

classified board structure would be fully dismantled by the 2021 annual meeting, when Caruso would then be up for a one-year term.[36]

### C. Project Unleash Is Planned and Bidders Express Interest.

In the fall of 2018, Zayo management was planning "Project Unleash," a restructuring plan that would split Zayo into two separate publicly traded entities.[37] Management believed that the project would "unleash[] latent value" and could be readily implemented by assigning each of Zayo's standalone business segments to one of the new entities.[38] Caruso anticipated that the announcement of Project Unleash would be "very positive news to the market," and management expected Project Unleash to take six to nine months to complete.[39]

Caruso presented Project Unleash to the Board on October 19, 2018.[40] He recommended that Zayo publicly announce Project Unleash during the Company's upcoming earnings call on November 7 (the "November 7 Earnings Call").[41] In a draft presentation, Caruso indicated that after the Company announced Project Unleash, it would be difficult to change course: "Once we start down this path, we

---

[36] *See id.*

[37] Compl. ¶ 54.

[38] *Id.* ¶¶ 54–58.

[39] Ex. 9; Compl. ¶ 59.

[40] Compl. ¶ 60.

[41] *Id.*

must finish or we'd have disappointed investors. So we better be committed."[42] At a Board meeting on November 6, 2018, JPM and GS opined that announced separations are generally well-received by the market.[43] The Board agreed that the Company should publicly announce Project Unleash.[44]

On October 19, 2018, the same day he announced Project Unleash to the Board, Caruso discussed indications of interest for a potential buyout. Earlier the same day, Caruso spoke with Ganzi, who suggested that Digital Bridge, an affiliate of Digital Colony, was interested in acquiring Zayo. Caruso sent an email to the Board about his conversations with Ganzi:

> Recall that Marc Ganzi of Digital Bridge approached me in the past re: taking Zayo private. He did not offer a price or indicate he had financial backing solidified. His approach required that I agree to be CEO. In a conversation with Marc earlier today, he indicated he expects to make a more formalized offer next week . . . . He also suggested my willingness to be CEO would be required. He offered that I could also be chairman, and that the syndicate consists of investors that know Zayo and me well.[45]

Caruso also informed the Board that Stonepeak Infrastructure Partners ("Stonepeak") had approached Caruso and would be meeting with him later that

---

[42] *Id.*

[43] Ex. 12 at '6300.

[44] Ex. 11.

[45] Compl. ¶ 61.

week.[46] Digital Colony ultimately led a group of successful bidders for the Company denominated as "Consortium B."[47] Stonepeak ultimately led a group of bidders denominated "Consortium A."[48]

On November 6, 2018, Zayo's then-Lead Independent Director, Philip Canfield, resigned from the Board, enabling him and his private equity firm, GTCR LLC, to join Consortium A.[49] That same day, Ganzi informed Caruso that Digital Colony was putting together a fully financed proposal at $41 to $42.50 per share.[50] Caruso reported Digital Colony's preliminary, oral indication of interest to the Board on the same day.[51]

### D.        Announcement of Project Unleash

Project Unleash was scheduled to be publicly announced during a quarterly earnings call scheduled for November 7, 2018.[52] Zayo's earnings that quarter came

---

[46] *Id.* ¶ 66.

[47] *Id.* ¶ 65.

[48] *Id.* ¶ 68. At the time, Caruso believed that Stonepeak was part of Ganzi's syndicate for Zayo. *Id.* ¶ 66; Ex. 9.

[49] Compl. ¶ 68.

[50] *Id.* ¶ 69.

[51] Ex. 11 (minutes of a meeting of the Board dated November 6, 2018, stating that "Mr. Caruso discussed with the Board a telephone call he received during the Board Meeting from a private equity firm in which it made a directional, and noted to be not finalized, offer to acquire the Company.").

[52] Compl. ¶ 72.

in below expectations.[53]  Zayo's financial advisor, JPM, recommended that Zayo begin the call with the announcement of Project Unleash before addressing the Company's earnings.[54]   JPM advised Steinfort that most strategic spin-off announcements were standalone events, but that in the few precedential joint spin-off/earnings announcements that JPM could find, the spin-off announcement had come first.[55]   Steinfort forwarded JPM's email to Caruso, noting that JPM's approach "makes sense," because "this way you can lead with the future/exciting part rather than having to go through all the results slides before you get to talk about Unleash."[56]  Caruso told Steinfort that he wanted to "keep summary slide in place, then I go through Unleash."[57]

Caruso began the quarterly earnings call on November 7 with the headline numbers reflecting Zayo's disappointing earnings.[58]  The Company had grown only 2%, missing its target of 6% to 8%.[59]  Revenue, EBITDA growth, EBITDA margin, and unlevered free cash flow had all declined as well.[60]  Caruso then discussed

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* ¶ 73.

[57] *Id.* ¶ 74.

[58] *Id.* ¶ 76.

[59] *Id.*

[60] *Id.*

Project Unleash, stating that the spin-off would "unleash a lot of latent value," and that "[i]nvestors will be able to value each business separately based on their respective strengths, their performance and the long-term prospects and it increases the degrees of freedom for further consolidation under both platforms."[61] Caruso anticipated that implementation of Project Unleash would proceed smoothly because "Zayo has long divided its business into segments that were pretty autonomous."[62]

Analysts were optimistic about Project Unleash. Nevertheless, the day after the combined announcement of Zayo's disappointing earnings and Project Unleash, Zayo's stock price fell over 25%, from $30.38 on November 7 to $22.56 on November 8.[63] On November 7, Ganzi emailed Caruso to congratulate him on the announcement of Project Unleash, noting that the idea "could be far easier executed if you are private."[64] Ganzi informed Caruso that he was working on getting Caruso "a written proposal with the sources of funding identified."[65] Two days later, on November 9, Stonepeak reached out and shared that it was "gliding toward" submitting an offer.[66] Caruso sent an email to the Board on November 9, saying:

---

[61] *Id.* ¶ 77.

[62] *Id.*

[63] *Id.* ¶ 78.

[64] *Id.* ¶ 79.

[65] *Id.*

[66] Ex. 13.

"Both Marc [Ganzi of Digital Colony] and Brian [McMullen of Stonepeak] expressed agreement with the Project Unleash plan."[67] Caruso's email to the Board also noted Ganzi's and McMullen's indications that offers were forthcoming.[68]

### E. The Sales Process Picks Up

On November 16, 2018, Consortium A delivered an initial indication of interest in acquiring Zayo at $33 per share, approximately a 49% premium over the previous day's closing price.[69] The Board met that same day to discuss the proposal as well as strategic alternatives, including Project Unleash.[70] Also appearing at the meeting were attorneys from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), who had been retained to advise the Board on a potential sale of the Company.[71] The Board concluded that Consortium A's offer "substantially undervalued the Company."[72] Shortly thereafter, on November 18, 2018, *Bloomberg* published an article "describing potential private equity interest in the Company."[73] The Board discussed the article and the news leak at a meeting later

---

[67] Compl. ¶ 80.

[68] Ex. 13.

[69] Compl. ¶ 96; Proxy at 30.

[70] Ex. 14.

[71] *Id.*

[72] *Id.*

[73] Compl. ¶ 81.

that same day.[74]  On November 19, Consortium A made a revised indication of interest to purchase Zayo at $34.50 per share.[75]  The Board decided that it would not respond immediately, but if Consortium A initiated contact, Consortium A was to be told that the revised proposal still undervalued the Company.[76]

Stockholder activism grew after the *Bloomberg* article emerged.  On November 27, 2018, JANA Partners ("JANA") contacted JPM to request a meeting with Caruso.[77]  JPM informed Caruso that JANA, as well as Elliott, "could clearly be advocating that we sell the Company sooner rather than later."[78]  On December 3 and 4, Caruso met with Senator Investment Group ("Senator") and Sachem Head Capital Management ("Sachem Head"), both of which advocated for a sale of the Company "in the low-to-mid $30s."[79]  The Strategy Committee observed that Sachem Head had "a very pointed message" that included "[a]bsent a deal, there is likely to be a proxy fight that starts with pushing for management change."[80]

---

[74] *Id.*; Ex. 15.

[75] Proxy at 31.

[76] Ex. 16.

[77] Compl. ¶ 83.

[78] *Id.*

[79] *Id.* ¶ 84.

[80] *Id.*

On December 7, 2018, Consortium A submitted an improved indication of interest at $35 per share, subject to prompt access to due diligence.[81] The Board met on December 9. The meeting minutes indicate that the Board discussed Consortium A's proposal and the prospect of running the Company on a standalone basis.[82] The Board concluded that the $35 per share offer warranted providing Consortium A with due diligence, with the caveat that Consortium A should be told that "the board had not agreed to do a transaction at $35/share."[83]

On December 11, 2018, JPM provided the Board with a presentation discussing Starboard Value ("Starboard").[84] JPM noted that Starboard had a history of undertaking proxy fights, including campaigns that resulted in the replacement of a CEO, and "will become increasingly adversarial if the company remains unresponsive."[85]

Caruso and others provided extensive management presentations to Consortium A on December 13, 2018.[86] At a December 16 Board meeting, Caruso informed the Board that there had not been any conversations with Consortium A

---

[81] *Id.* ¶ 96. Prior to December 7, 2018, two different strategic acquirors contacted Zayo about the possibility of a merger. Proxy at 31–33.

[82] Ex. 19.

[83] Compl. ¶ 96.

[84] *Id.* ¶ 85.

[85] *Id.*

[86] *Id.* ¶ 96.

about "his continued employment with the Company following any transaction."[87] That same day, Consortium B provided an indication of interest at $36 to $38 per share.[88] Caruso provided management presentations to Consortium B on December 20, 2018.[89] Between December 16 and December 19, Zayo's bankers reached out to 18 additional potential strategic and financial acquirors at the direction of the Board.[90]

On December 19, 2018, Zayo management sought Board approval for financial terms of the Company's engagement of GS and JPM in the sale process.[91] The engagement letters provided that the financial advisors would each be paid a fee of about $3 million for their opinions on the Merger at the announcement of a transaction,[92] and $27.2 million more if Zayo was sold for at least $33 per share, with a higher payout for a higher price[93]. The Board unanimously approved the terms at a meeting on January 2, 2019.[94]

---

[87] Ex. 21. The Complaint does not mention that this meeting occurred, but Defendant raised and discussed it in his opening brief, and Plaintiffs did not object, noting their agreement to consider the § 220 production incorporated by reference into the Complaint. Oral Arg. Tr. 91:9–14.

[88] Compl. ¶ 97

[89] *Id.*

[90] Ex. 23 at '3125.

[91] Compl. ¶ 98.

[92] Proxy at 62, 68.

[93] Compl. ¶ 98.

[94] Ex. 25.

Also on December 19, Senator sent a letter to the Board blaming Caruso for the Company's results and demanding a sale of the Company.[95] Senator stated that Caruso "has not proven adept at running a public company" and that "shareholders have lost confidence in [Caruso's] leadership and capability to manage this business in a public context."[96]

On December 26, 2018, Caruso sent the Board a draft letter to investors stating that Caruso intended to abandon Project Unleash and to "reposition our 2019 strategy as 'Stay the Course.'"[97] The letter was never sent to investors.[98] On January 7, 2019, Caruso sent a presentation to the Board stating that a reason to avoid implementing Project Unleash was that "[p]rivate equity interest" had "emerged with own ideas."[99] Caruso explained to the Board that Zayo management had changed course from implementing Project Unleash to reorganizing Zayo's five business segments into three segments: Colocation, Allstream, and a "Network" unit consisting of the former Fiber Solutions, Transport, and Enterprise Networks

---

[95] Compl. ¶ 86.

[96] *Id.*

[97] *Id.* ¶ 99.

[98] *Id.*

[99] *Id.* ¶ 101.

business segments.[100]  This new configuration of assets had a comparable sum-of-the-parts valuation as Project Unleash, ranging from $33.76 to $49.[101]

In a January 25, 2019 letter, Sachem Head advocated for a sale, citing "management's track record of poor execution" and expressing that "the public market has lost faith in management."[102]  On January 30, 2019, Senator expressed to GS and JPM its frustration and concerns about Caruso.[103]  The next day, Senator sent Caruso an email, telling him: "In our view, a decision not to accept a reasonable offer will likely result in shareholder actions to replace senior management if execution doesn't improve quickly."[104]  Another investment firm, Avenir Corporation, sent a letter to the Board, questioning Caruso's ability to run a public company and demanding that the Board find a solution.[105]

At a Strategy Committee meeting on February 5, 2019, management presented an "Activist Update."[106]  The presentation noted that activist funds had increased their stock ownership from 4% to 13% over the previous eight months,

---

[100] *Id.* ¶ 102.  Zayo implemented this new asset structure after it executed the Merger Agreement with Consortium B.  *Id.* ¶ 103.

[101] *Id.* ¶ 108.  Through May 7, 2019, Zayo's financial advisors continued to model Project Unleash, and they assigned it a value ranging from $36 to $46.  *Id.* ¶ 109.

[102] *Id.* ¶ 88.

[103] *Id.* ¶ 89.

[104] *Id.* ¶ 90.

[105] *Id.* ¶ 93.

[106] *Id.* ¶ 92.

and that the activists were focused on driving the Company towards a sales process.[107]

Caruso stopped mentioning Project Unleash in public announcements.[108] On a February 7, 2019 earnings call, Zayo did not discuss Project Unleash and stated that it was "evaluating multiple options."[109] The February 7 earnings call caused confusion among Zayo's analysts and investors.[110] Deutsche Bank cited the call's "mixed messaging" as contributing to investor confusion and Zayo's stock's "slight underperformance."[111] Morningstar also attributed the confusion and "investor angst" to the Company's "reversal" and "vacillation," noting that it did not "hear a clear rationale behind [Zayo's] decision."[112] SunTrust stated that it "found the conference call's discussion around long-term strategy confusing."[113]

### F. Consortium A and Consortium B Submit Bids

By January 2019, Consortium A sought to minimize competition for its bid on Zayo. It attempted to lock up co-investment and financing sources, convince others that they had a deal for Zayo cemented, and worked with press and

---

[107] *Id.*

[108] *Id.* ¶ 110.

[109] *Id.*

[110] *Id.* ¶ 111.

[111] *Id.*

[112] *Id.*

[113] *Id.*

stockholder activists to create pressure for a deal.[114] At a meeting on January 13, 2019, the Board discussed "what appears to be a propaganda campaign by Consortium A to claim they had [a] deal for the Company locked up."[115] On January 14, 2019, JPM told Digital Bridge (*i.e.*, Consortium B) that "there is still time for them to get into the game if they start working ASAP."[116] Digital Bridge responded by saying that "the task of catching up to others is too daunting" and that it was "not going to do further work."[117] On January 30, 2019, at a conference in Florida, Caruso met separately with Ganzi and with a representative of EQT Fund Management S.à r.l. ("EQT"), where he encouraged them to partner and make a bid for Zayo.[118]

On February 4, 2019, Consortium A confirmed completion of due diligence and revised its bid lower, from $35 to $31.50 per share.[119] At the Board's meeting on February 5–6, the Board discussed "the Company and its future standalone prospects," the revised offer, a potential sale of the Colocation business segment, and strategies for getting re-engagement from other potential bidders, including

---

[114] *Id.* ¶¶ 112–17.

[115] *Id.* ¶ 115.

[116] *Id.* ¶ 116.

[117] *Id.*

[118] *Id.* ¶ 128.

[119] *Id.* ¶ 123.

Consortium B.[120]  As for Consortium A, the Board responded to the lower proposal by accusing Consortium A of leaking information about the sale process to the press and to stockholder activists, in violation of a confidentiality agreement.[121]  Caruso, Spruill, and Zayo's bankers discussed how to foster competition.  In an email chain between Caruso, Spruill (the Company's Lead Independent Director), and the bankers, the bankers recommended the following approach: "At its core, script to [Consortium] A is 'you are not $35, no next step . . .' And script to  [Consortium] B is 'you can win, how do we get you moving?'"[122]

On February 11, 2019, Caruso had a call with Ganzi.  According to a summary of the call that Caruso gave to the bankers and the Board's Lead Independent Director (Spruill), later that night, Ganzi was "interested in proceeding forward" and showed "price enthusiasm in $34-36 range."[123]  Caruso said to Ganzi, "I can't speak for board on price, but [] they've shown willingness to engage at $35+ but not willingness at lower prices."[124]  The same week, Caruso conveyed this same

---

[120] Ex. 32.

[121] Compl. ¶¶ 124–25.

[122] Ex. 34.

[123] Compl. ¶ 130.

[124] *Id.*; Ex. 33.

information about his call with Ganzi in a February 16 email to Zayo's bankers, management, Skadden, and Spruill.[125]

On February 20, Consortium A made a new bid at $32 per share.[126]  That same day, Consortium B indicated that it was finalizing an offer of approximately $35 per share.[127]  The Board met on February 24 to discuss Consortium A's new offer, Consortium B's anticipated offer, and the prospect of remaining a standalone company while selling certain business segments.[128]  After discussion with the bankers and in consultation with Spruill, the Board authorized management to enter into an exclusivity agreement with Consortium B, should the anticipated offer come in at $35.[129]

On February 26, Consortium B formally submitted its proposal to acquire Zayo for $35 per share.[130]  The parties entered into a 30-day exclusivity agreement, with the option to twice extend exclusivity by 10 days so long as Consortium B reaffirmed that it was committed to $35 per share.[131]

---

[125] Ex. 36.

[126] Proxy at 42.

[127] Compl. ¶ 131.

[128] Ex. 38.

[129] *Id.*

[130] Compl. ¶ 132.

[131] *Id.* ¶ 134.

In a March 21 call with Caruso and Steinfort, members of Consortium A, who were aware of Zayo's exclusivity agreement with Consortium B, tried to discuss the possibility of their acquiring the Company independent of Consortium A.[132] Caruso explained that he could not discuss the matter due to the exclusivity agreement and ended the call.[133] Consortium B was informed of this conversation on March 22, as per the terms of the exclusivity agreement.[134]

On March 28, Consortium B expressed that it wished to partner with Zayo's management team to ensure there was a capable management team in place following any acquisition.[135] Caruso responded that he would not discuss post-closing retention of management unless authorized to do so by the Board.[136]

On April 4, in a letter to Zayo, Consortium B reaffirmed its offer of $35 per share and exercised its right to extend the exclusivity period for ten days as per the exclusivity agreement.[137] Consortium B similarly reaffirmed its offer and extended the exclusivity period on April 14.[138] On April 19, the Board discussed its options in the event that Consortium B asked for a third extension of the exclusivity

---

[132] Proxy at 44–45.

[133] *Id.* at 45.

[134] *Id.*

[135] *Id.*

[136] *Id.* at 45–46.

[137] *Id.* at 46.

[138] *Id.*

agreement.[139]  The Board determined that further extension of the exclusivity agreement was unnecessary because the Company and Consortium B were "close enough" to a deal.[140]

As negotiations continued, the exclusivity period lapsed.  Consortium B asked to extend its exclusivity agreement with Zayo, but the Company refused.[141]  Instead, on April 25, at the behest of Consortium B, the parties agreed to sign a letter agreement where the parties agreed to continue to pursue the Merger in good faith (the "Letter Agreement").[142]  The terms of the Letter Agreement also stated that the Company would not enter into a definitive agreement, sign a letter of intent, or enter into an exclusivity agreement with a party other than Consortium B.[143]  The Letter Agreement was set to expire on May 8, 2019.[144]

On April 26, the Board discussed Consortium B's renewed request for an exclusivity agreement.[145]  The Board granted Caruso the authority to negotiate a "limited restriction on the Company's ability to seek alternative transactions" prior to the Letter Agreement's termination and to "otherwise expand the obligations"

---

[139] *Id.* at 47.

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.* at 48.

under the Letter Agreement, if necessary.[146]  That same day, Zayo and Consortium B expanded the terms of the Letter Agreement so that, in addition to the previous terms, Zayo could not divest any material assets outside the ordinary course of business, initiate contact with another party regarding a potential acquisition of the Company, or permit another party to speak with potential financial sponsors that Consortium B had previously identified as potential co-investors.[147]

### G.        Potential Sale of the Colocation Business

At the same time that it was running a sale process for the whole Company, Zayo management was running a sale process for the Colocation business.[148]  A February 24, 2019 management presentation to the Board showed that the Colocation business was worth approximately $6 to $7 per share.[149]  On April 10, 2019, Zayo received four bids for the Colocation business, with the highest coming in at approximately $8 per share.[150]  On April 19, 2019, a management presentation to the Board showed that the remaining business segments would be worth $27 to

---

[146] *Id.*

[147] *Id.*

[148] Compl. ¶ 136.

[149] *Id.* ¶ 137.  The February 24 presentation valued the remaining business at $31 to $41 per share, for a total enterprise value of $37 to $48 per share.  *Id.*

[150] *Id.* ¶ 138.

$36 per share by year-end.[151]   The Board discussed the possible sale of the Colocation business at its Board meetings on February 24 and March 22, 2019, as a potential alternative to the acquisition proposals for the whole company.[152]

**H.      Consortium A Ups Its Offer but the Board Accepts the Offer from Consortium B**

On May 1, 2019, Consortium A increased its offer to $33.50 per share.[153]  On May 3, Caruso told Consortium B that Zayo had "received a written proposal from another party" but that "this other proposal is extremely unlikely to impact our transaction."[154]   Caruso told Consortium B that Zayo was maintaining its "commitment to prioritizing our resources to consummate the transaction with you."[155]  Consortium B responded by confirming its willingness to acquire Zayo at $35 per share.[156]

Also on May 3, 2019, along with confirming its willingness to engage in the Zayo acquisition, Consortium B requested permission from the Board to "discuss the terms of management's continued investment in the Company and post-closing

---

[151] *Id.* ¶ 139.  The April 19 presentation valued the Colocation business at $6 to $8 per share, for a total enterprise value of $33 to $44 per share.  *Id.*

[152] Proxy at 42, 45.

[153] Compl. ¶ 141.

[154] *Id.* ¶ 142.

[155] *Id.*

[156] *Id.*

management equity incentive arrangements" with Caruso and the senior management team.[157] Later that day, the Board's Compensation Committee agreed to permit Caruso and other senior executives to discuss potential management roles with the Company and a potential equity rollover with Consortium B.[158] Following the Compensation Committee's approval, EQT and Ganzi reassured Caruso that they were interested in having him continue as CEO.[159]

At a Board meeting on May 7, 2019, JPM and GS presented their fairness analyses.[160] The JPM presentation valued the whole company at $21.75 to $43.50 per share (based on trading multiples).[161] The JPM presentation also contained two sum-of-the-parts value ranges: $36 to $45.75 per share (based on trading multiples) and $31.50 to $45.25 per share (based on transaction multiples).[162] Management's presentation to the Board on May 7 did not project standalone value for the Network business, unlike in its previous presentations on February 24 and April 19.[163] The Board voted to approve the Merger at the May 7 meeting.[164] At the May 7 meeting,

---

[157] Proxy at 49.

[158] *Id.*

[159] Compl. ¶ 142; Proxy at 49–50.

[160] Compl. ¶ 144.

[161] *Id.*

[162] *Id.*

[163] *Id.* ¶ 145.

[164] *Id.* ¶ 146.

the Board also discussed a proposed equity rollover by Zayo management.[165] Board member Kaplan reported that Caruso and Consortium B had not discussed Caruso's future employment or potential equity rollover before they struck the Merger deal terms.[166] Zayo and Consortium B agreed to a termination fee of approximately $210 million, or 2.5% of equity value in the event that the transaction was not consummated.[167]

Zayo publicly announced the Merger on May 8.[168] Later that day, Caruso entered into a rollover letter agreement, whereby Caruso agreed to rollover approximately $105 million of equity in the Company, representing approximately 30% of his Zayo holdings.[169]

### I. The Proxy

On June 26, 2019, Zayo issued the Proxy soliciting stockholder approval for the Merger.[170] Regarding activist investors, the Proxy stated that "on December 3 and 4, Mr. Caruso and the Company's representatives met with certain activist stockholders. Two activist stockholders encouraged the Company to consider

---

[165] Ex. 44 at '6520.

[166] Compl. ¶ 147; Ex. 44 at '6520. Plaintiffs contend that this statement was misleading, pointing to Caruso's and Ganzi's discussions as early as July 2018. Pls.' Ans. Br. 26.

[167] Proxy at 108.

[168] Compl. ¶ 146.

[169] *Id.* ¶ 147; *see* Proxy at 50.

[170] Compl. ¶ 148; Proxy at v.

strategic alternatives for the Company, including a sale of the Company in the low to mid-$30 range."[171] The Proxy also mentioned the March 7, 2019 public letter from Starboard urging the Company to sell.[172] Regarding conversations between Caruso and Ganzi, the Proxy stated that Caruso and Ganzi had a phone call on February 20, 2019, in which "Ganzi provided an oral indication on behalf of Consortium B that it would be in a position to make a proposal of $35.00 per share of Company common stock."[173] The Proxy also stated that Caruso refused to discuss his ongoing role with Zayo until after Merger terms were agreed to, unless authorized to do so by the Board.[174] Caruso signed the Proxy in his capacity as Zayo's CEO.[175] Zayo stockholders approved the Merger on July 26, 2019.[176] The Merger received overwhelming support, with 183,453,673 votes for the Merger, 148,273 against, and 139,766 abstentions.[177]

## J. Procedural History

After the announcement of the Merger, Plaintiffs made demands and filed complaints to inspect Zayo's books and records pursuant to 8 *Del. C.* § 220. Zayo

---

[171] Compl. ¶ 149; Proxy at 33.

[172] Compl. ¶ 149; Proxy at 44.

[173] Compl. ¶ 151; Proxy at 42.

[174] Compl. ¶ 154; *e.g.*, Proxy at 27.

[175] Compl. ¶ 155.

[176] Ex. 2.

[177] Zayo Group Holdings, Inc., Current Report (Form 8-K) (July 26, 2019)

produced nearly 10,000 pages and more than 1,400 documents to Plaintiffs, including Caruso's emails with Jan Vesely, a Partner of EQT[178] and a member of Consortium B; Ganzi; Zayo's bankers; former Lead Independent Director Canfield; and director Gips.[179]

The Merger closed on March 9, 2020.[180] On July 24, 2020, Plaintiffs filed their Verified Class Action Complaint (the "Complaint"). The Complaint contains just one count, alleging that Caruso breached his fiduciary duties as a director and officer of Zayo.[181] Defendant moved to dismiss the complaint on October 30, 2020. After briefing on the motion, the Court heard oral argument on May 19, 2021.

## II. ANALYSIS

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

---

[178] Proxy at 39.

[179] Def.'s Opening Br. 29.

[180] *Id.*

[181] Compl. ¶¶ 162–65 (Count I).

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted).[182] The pleading standards are minimal. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldngs. LLC*, 27 A.3d 531, 536 (Del. 2011). Nevertheless, "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

The Complaint contains a single count for breach of fiduciary duty against Caruso as a director and officer of Zayo. Plaintiffs have not asserted claims against any other Zayo director or officer. Under Delaware law, "[a] plaintiff need not allege

---

[182] Despite this being a ruling on a motion to dismiss, the parties have utilized evidence in their arguments that is outside of the pleadings, possibly triggering a motion for summary judgment. *See* Del. Ch. Ct. R. 12(c). At oral argument, I asked Plaintiffs why they did not argue that their motion should be converted into one for summary judgment. Oral Arg. Tr. 90:5–9. The Parties acknowledged that they had an agreement as to incorporate by reference any documents that were produced by Defendant under 8 *Del. C.* § 220, but Plaintiffs could not recall if they had specifically agreed not to move for summary judgment. Oral Arg. Tr. 90:10–91:14 ("I forget if it was based on . . . the terms of the confidentiality agreement. . . . I'm guessing, I think, whether that was just fair under what we agreed to.").

that a majority of the board committed a non-exculpated breach . . . in order to state a claim against a disloyal CEO." *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *3 (Del. Ch. Dec. 10, 2018); *accord In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *51 (Del. Ch. Mar. 1, 2021). Zayo's certificate of incorporation contains an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7).[183] As a result, the claims in the Complaint may only survive to the extent that they are non-exculpated.[184]

"Delaware's default standard of review is the business judgment rule." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *25 (Del. Ch. Apr. 14, 2017). Under the business judgment rule, the court will assess whether the business decision "was rational in the sense of being one logical approach to advancing the corporation's objectives." *Id.* (internal citations omitted). The business judgment rule may be rebutted and a higher standard of review may apply. If, at the pleading stage, the complaint alleges "facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority," the court will review the transaction under the entire fairness standard. *Id.* at *26. Under the entire fairness standard, defendants must establish that the

---

[183] Ex. 2, at Ex. 3.1, Art. 7.

[184] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

transaction was objectively fair. *Id.* (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)). Alternatively, if directors "are confronted with a change of control transaction that presents the board with the opportunity to secure 'the best value reasonably available to the stockholders,'" the court will subject the transaction to enhanced scrutiny under *Revlon*. *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *12 (Del. Ch. Aug. 16, 2021) (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)). Under *Revlon*, the court must assess the reasonableness of the directors' efforts to secure the best price available to the company's stockholders. *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014).

Plaintiffs argue that the Merger is subject to entire fairness review. According to Plaintiffs, even though Caruso does not own over 50% of the outstanding shares of Zayo stock and this was not a controlling stockholder transaction, Caruso harbored a conflict of interest because he sought to enrich himself personally through the Merger. Plaintiffs contend that a majority of Zayo's board of directors lacked independence from Caruso, thus causing the Merger to be subject to entire fairness review.[185] In the alternative, Plaintiffs argue that Caruso is liable for breach of his fiduciary duty because the Board did not satisfy enhanced scrutiny under *Revlon*.[186]

---

[185] Pls.' Ans. Br. 41.

[186] *Id.* at 28.

As a final matter, Plaintiffs argue that Caruso breached his fiduciary duties because the Proxy issued in support of the Merger was materially misleading.[187] This Opinion addresses each issue in turn.

## A. The Complaint Pleads that Caruso Is Conflicted.

The first step in the analysis is to determine whether the Complaint contains facts sufficient to support a reasonable inference that Caruso was a conflicted fiduciary. The extent of Caruso's conflicts of interest is relevant to Plaintiffs' arguments that this transaction is subject to entire fairness or, in the alternative, subject to the heightened standard of review set forth in *Revlon*. The question is relevant to the entire fairness analysis because Plaintiffs allege that a majority of Zayo's Board was beholden to Caruso and furthered Caruso's self-interests. If Plaintiffs did not adequately allege that Caruso was conflicted or self-interested during the transaction, the foundation of Plaintiffs' theory falls apart. The question of Caruso's conflicts of interests is relevant to the *Revlon* analysis because it is central to Plaintiffs' claim that Caruso acted in a conflicted manner and that Zayo's Board did not adequately supervise him.

"Regardless of the underlying theory, the key in evaluating whether financial interests gave rise to a disabling conflict is to look to the subjective intent of the fiduciary. At the pleading stage, the question is whether it is reasonably conceivable

---

[187] *Id.* at 46.

that the fiduciary was subjectively affected by the conflict at issue." *In re Mindbody, Inc.*, 2020 WL 5870084, at \*16 (Del. Ch. Oct. 2, 2020). Plaintiffs argue that Caruso sought to maintain his job as the CEO of the Company, that he was under pressure from activist stockholders who were displeased with his performance at Zayo,[188] and that Caruso sought to enrich himself through obtaining equity in the post-acquisition company.[189]

From the outset of their discussions, Ganzi indicated that he would require Caruso staying on as CEO.[190] Caruso informed the Board that Ganzi's "approach required that I agree to be CEO," that Caruso's "willingness to be CEO would be required," and that Ganzi offered that Caruso "could also be chairman."[191] After Caruso announced Project Unleash in November 2018, Ganzi reinforced his intent

---

[188] Plaintiffs' argument that Caruso faced a threat of losing his job due to activist pressure is inconsistent with their contention that a majority of the Board was "subordinate to Caruso's status as a benefactor, investor, and the most prominent tech executive in the tech hub of Boulder." Pls.' Ans. Br. 6. Caruso had just won re-election to a three-year term on November 6, 2018. He was unopposed and received 197,766,808 of the votes cast. Zayo Group Holdings, Inc., Current Report (Form 8-K) (November 6, 2018). If, as Plaintiffs assert, six of the eight outside directors were subservient to Caruso, then Caruso's position was safe for at least two more years.

[189] Pls.' Ans. Br. 34.

[190] Compl. ¶ 61.

[191] *Id.*

to have Caruso stay at the helm of Zayo, when he congratulated Caruso and told Caruso that Ganzi and his partners would "back you in a private setting."[192]

In *Mindbody*, the court concluded that the CEO's stated desire for near-term liquidity and future employment with a favored bidder made it reasonably conceivable that his interests conflicted with those of the public stockholders. *Mindbody*, 2020 WL 5870084, at *19–20. In contrast, in *In re Toys "R" Us, Inc. S'holders Litig.*, the court determined that an acquiror's direct message that its bid was conditioned on the retention of key (but unspecified) members of management did not give rise to a disabling conflict. 877 A.2d 975, 1003 (Del. Ch. 2005). The well pleaded allegations here fall somewhere in between *Mindbody* and *Toys "R" Us*. Procedurally, *Mindbody* was decided on a motion to dismiss, whereas *Toys "R" Us* was on a motion for a preliminary injunction. For purposes of the pending motion, I conclude that the Complaint alleges Caruso's knowledge that Consortium B required his continuation as CEO to create a pleading-stage inference that he harbored personal interests that conflicted with those of the Zayo public stockholders.

In doing so, however, I do not draw a pleading-stage inference that Caruso labored under a cognizable threat from activist stockholder pressure to oust him as

---

[192] *Id.* ¶ 79; *see also id.* ("I like your idea below, could be far easier executed if you are private.").

CEO. The mere threat of a proxy contest does not render a director conflicted. *See In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *12 (Del. Ch. Jan. 3, 2013). Yet as the court observed in *Rudd v. Brown*, "[t]he threat of a looming proxy contest might inform the inference of conflict at the pleading stage 'when coupled with other pled facts.'" 2020 WL 5494526, at *8 (Del. Ch. Sept. 11, 2020) (quoting *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *14 (Del. Ch. Nov. 20, 2018)).

Plaintiffs' assertion of conflict and misalignment of Caruso's interests due to activist pressure are not cognizable, even at the pleadings stage. There were no allegations of a threatened proxy contest prior to the November 18, 2018 *Bloomberg* article describing private equity interest in the Company. Although the Board and its advisors monitored activist investor activity, there was no threat of a proxy contest. Plaintiffs do not allege that the Board's other directors ever exerted pressure on Caruso or told him that his job was in jeopardy. *Cf. In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (CEO knew that the board of directors, in addition to stockholders, was "displeased with his performance and likely would remove him from office if a sale of the Company did not occur"). Instead, they allege the opposite—that the Board was in his pocket. Even after some stockholders sought to exert pressure to accept an offer in the low to mid $30s, they did not launch a proxy contest or expressly threaten one. Indeed, a January 2019

38

letter to Caruso from Zimmer Partners, clearly stated, "We are not activists."[193] Nevertheless, it is reasonably conceivable under the well pleaded factual allegations that Caruso was a conflicted fiduciary with respect to the Merger, based on his prospective employment.[194]

## B. Entire Fairness Review

Plaintiffs argue that the Merger is subject to entire fairness review because a majority of Zayo's Board was not independent from Caruso and placed his interests above their fiduciary duties by approving the Merger.[195] For a duty of loyalty claim against Caruso to survive a motion to dismiss under this theory, the Complaint must state facts creating a reasonable inference that a majority of the directors "(1) were self-interested or not independent or (2) acted in bad faith." *Miramar Firefighters*

---

[193] Ex. 27.1. The letter is mistakenly dated January 25, 2018, as it was emailed on January 25, 2019. *See* Ex. 27.

[194] Plaintiffs allege that Caruso was conflicted because, if he could arrange a sale of the Company to a management-friendly private equity buyer, Caruso would be able to roll over a significant portion of his equity. Pls.' Ans. Br. 34. The Complaint contains no well-pleaded allegations that Caruso reached any agreement to roll over his equity during the Merger negotiations or any other facts that would tend to demonstrate that Caruso acted in a conflicted manner as a result of his hopes of securing equity in the Company after its acquisition. *See* Compl. ¶ 147 (alleging that Caruso entered into a rollover letter agreement the day after the Board voted to approve the Merger); *City of Warren Gen. Emps.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *13 (Del. Ch. Nov. 30, 2020). Nor do Plaintiffs allege that Caruso engaged in such discussions concerning an equity rollover absent Board authority. *Cf.* Ex. 41 (Caruso confirming at an April 26, 2019 Board meeting that there had been no discussion between management and Consortium B regarding an equity rollover).

[195] *See* Pls.' Ans. Br. 41–46.

*Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at \*3 (Del. Ch. July 31, 2013)

(citing *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239–40 (Del. 2009)).

The Complaint does not allege that a majority of the Board was self-interested in the Merger. Thus, the relevant inquiry is one of director independence. The entire fairness standard applies where the board of directors lacks an independent majority when approving a transaction. *Frederick Hsu Living Tr. v. ODN Holding. Corp.*, 2017 WL 1437308, at \*26 (Del. Ch. Apr. 14, 2017). To make this determination, "a court counts heads" and conducts a "director-by-director analysis." *Id.* The court starts from the presumption that directors are independent. *See id.* To overcome the presumption that a director is independent, a plaintiff must plead facts demonstrating that a director is "loyal to, beholden to, or otherwise influenced by an interested party" in order to establish a reason to doubt whether the director is capable of objectively judging the matter in question. *Id.*

A director may be beholden to an interested party through "personal or other relationships," *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938–39 (Del. Ch. 2003) (internal quotations omitted), but "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

> Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with

40

the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence. Rather, the Supreme Court has made clear that a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties.

*In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) (footnotes omitted), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). The court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs." *Delaware Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). But the allegations must be sufficient to demonstrate a "*substantial reason*" to find that a director cannot "mak[e] a decision with only the best interests of the corporation in mind." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d at 938 (internal quotations omitted) (emphasis in original).

Zayo's Board consists of nine directors. As discussed above, the court assumes that Plaintiffs have adequately alleged a pleadings-stage inference that Caruso was conflicted. If a majority of the directors could not have placed the interests of Zayo's stockholders above Caruso's personal interests in approving the Merger, it is possible that the entire fairness standard would apply to the transaction. To raise the standard of review to entire fairness, Plaintiffs must plead that at least

41

four other directors were sufficiently loyal to or beholden to Caruso.[196]  It is not enough to merely allege that the Board went along with Caruso's plan or succumbed to his desire to steer the sale of the Company to a private equity buyer.  *Miramar*, 2013 WL 4033905, at *3.  In their briefing and at oral argument, Plaintiffs focused their argument on six directors: Drake, Kaplan, Rottenberg, White, Gips, and Spruill.

Plaintiffs make no allegations that call into question the independence of Connor or Morris.  Thus, Plaintiffs must allege that four of the other six outside directors were not independent of Caruso.  As discussed herein, the Complaint does not adequately allege that a majority of the directors were not independent, let alone under Caruso's control.

### 1. Drake.

Drake joined the Board on November 7, 2018.[197]  Drake is a prominent Boulder entrepreneur, and Caruso's family foundation was an early investor in Drake's company.  Drake's company was an early member of the Blackstone Entrepreneurs Network, for which Caruso sat on the steering committee and to which Zayo donates.  In November 2019, Drake was the featured entrepreneur at Silicon Flatirons, of which Zayo and Caruso are lead sponsors.  Drake and Caruso

---

[196] Plaintiffs do not argue that any directors had a conflict of interest independent of their relationship with Caruso.

[197] The following facts are alleged in paragraphs 21–22 of the Complaint.

42

live within one mile of each other.  Their children attended the same high school and played sports together.  Drake's two sons and Caruso's son all attended the Miami University of Ohio (Drake's alma mater), and their families have traveled together on college-related trips on Caruso's charter plane.  The family members' social media accounts display their connections, including in group photos.[198]  Zayo and Caruso donate to the nonprofit at which Drake's wife works, and Drake's elder son has worked for Zayo since graduating college in 2017.

Based on these allegations, it is reasonably conceivable that Drake could not act independently in evaluating the Merger.  Drake's and Caruso's personal connections go beyond moving in the same social circles, living in the same school district, or being Facebook friends.[199]  Their families take trips together on a private plane chartered by Caruso, and their children publicly hold themselves out on social media to be as close as family.  The extent and nature of these connections are "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."

---

[198] In addition to frequent comments on each other's posts, the background cover photo for Caruso's son is a group photo of the Caruso and Drake siblings.  Compl. ¶ 22.  Caruso's son's comment on the photo is "Oh the classic Fam."  *Id.*

[199] *Cf. Beam*, 845 A.2d at 1051–52 ("Mere allegations that they move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.").

43

*Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016) (finding that a director was not independent from the CEO, where their families co-owned a private airplane).

Defendants argue that *Sandys* is factually distinguishable from this case because it involved "unusual facts."[200] In *Sandys*, the Supreme Court held that co-ownership of a private plane between directors was an "unusual fact" evidencing that the two were "extremely close."[201] In *Sandys*, the Supreme Court observed that sharing a private plane required "close cooperation . . . which [was] suggestive of detailed planning indicative of a continuing, close personal friendship." *Sandys*, 152 A.3d at 130. Here, Plaintiffs allege facts that support a reasonable inference that Drake's and Caruso's families are close: their children attended the same high school; members of the Drake and Caruso families are connected on social media and comment on each other's social media pages; members of the families have traveled together on a private plane that Caruso chartered for personal and business travel; and in one social media post, one of the children characterizes a group photo of the Drake and Caruso children as a single, "classic [f]am[ily]".[202] In addition, Drake's son was working for Zayo, where Caruso is CEO. Together, these allegations are sufficient to allege that Caruso and Drake have a "continuing, close

---

[200] Def's. Reply Br. 5 n.4 (citing *Sandys*, 152 A.3d at 130).

[201] *Id.* (citing *Sandys*, 152 A.3d at 130).

[202] Compl. ¶ 22.

44

personal friendship" that often involves "detailed planning," just as in *Sandys*. *Sandys*, 152 A.3d at 130; *see Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("[I]t is a reasonable inference from the alleged particularized facts that the combination of relationships between Coulter and Mandigo, along with Coulter's position as CEO of the company that employs Mandigo's son, would be sufficiently material to preclude Mandigo from being able to consider demand without improper considerations intervening."). The Complaint alleges facts from which it is reasonably conceivable that Drake would place Caruso's interests first when determining whether to approve the Merger.

### 2. Kaplan.

Kaplan joined the Board in 2017.[203] He has been a professor at the University of Chicago Booth School of Business ("Chicago Booth") since Caruso was a student there, and he is the faculty director of the Polsky Center. Between 2015 and 2018, Caruso's family foundation has donated approximately $350,000 to Chicago Booth, and Caruso has also caused Zayo to donate to Chicago Booth. In 2017 and 2018, Caruso served as a judge in the Polsky Center's New Venture Challenge, and he invested a total of $125,000 with top competitors. On Kaplan's director questionnaire for 2019, Kaplan acknowledged that Caruso's and Zayo's

---

[203] The following facts are alleged in paragraph 19 of the Complaint.

45

contributions to Chicago Booth would affect Kaplan's ability to exercise independent judgment in making decisions about executive compensation.

Kaplan's own acknowledgement of his lack of independence as to executive compensation is sufficient to cast doubt on his ability to exercise independent judgment with respect to the Merger. Although Kaplan completed the 2019 director questionnaire after approving the Merger, it is reasonably inferable that he would labor under Caruso's influence when later voting for the Merger, particularly when the events cited as calling into question his independent judgment (*i.e.*, Caruso's donations to Chicago Booth) occurred prior to Merger negotiations. Plaintiffs have adequately alleged that Kaplan was not independent from Caruso with respect to the Merger.[204]

### 3. Rottenberg

Rottenberg joined the Board in 2014.[205] She has earned over $1,269,000 as a director of Zayo. Rottenberg is the co-founder and CEO of Endeavor, a global nonprofit that supports and co-invests in high-impact entrepreneurs. In 2015, Caruso co-hosted a ticketed event in Boulder promoting Rottenberg's new book. In 2017,

---

[204] Caruso's counsel conceded this point at oral argument. Oral Arg. 19:16–20:22 ("I don't have an answer for why [Kaplan] listed on his director questionnaire that he shouldn't be involved in compensation. . . . [W]e've let that one go.").

[205] The following facts are alleged in paragraph 18 of the Complaint.

Caruso's family foundation invested in an Endeavor fund. In 2019, Caruso assisted in launching, funding, and chairing the board of Endeavor's new Colorado chapter.

In some circumstances, an interested individual's support of a nonprofit associated with a director can serve as a basis for adequately alleging that the director lacks independence from the supporter. In *Cumming ex rel. New Senior Inv. Grp., Inc. v. Edens*, the plaintiff alleged that a director of a company, who was also employed in a leadership position at a nonprofit, lacked independence from the company's CEO, whose family foundation made substantial contributions to the nonprofit and whose wife was a longtime member of the nonprofit's board of directors. 2018 WL 992877, at *14 (Del. Ch. Feb. 20, 2018). The CEO's daughter had promoted the nonprofit on national television, and the CEO had publicly provided hands-on support of the nonprofit's humanitarian aid efforts. *Id.* The plaintiff also alleged that the director derived over half of her annual income from service on multiple boards, as facilitated by the CEO. *Id.* Under those circumstances, "[w]hen the [CEO's] family's ties to [the nonprofit] are coupled with the substantial and clearly material director fees [the director] received from service on boards at the behest of [the CEO]," the Court concluded that there was reason to doubt the director's independence from the CEO. *Id.* at *15.

The allegations in this case are not sufficient to impugn Rottenberg's independence. First, the Complaint does not allege the amount of any contribution,

donation, or sponsorship from Caruso or his family foundation to Rottenberg or her nonprofit. Hence, the allegations that Caruso has supported Rottenberg's nonprofit are not nearly as strong as the allegations in *Cumming*. Unlike the facts in *Cumming*, Plaintiffs do not allege that Rottenberg draws a material percentage of her income based on her relationship with Caruso. There is no well-pleaded allegation that Rottenberg's annual director fees—$200,000 for service on Zayo's board of directors—make up a large percentage of her income or that they are otherwise material to her.[206] Nor do Plaintiffs deny that Rottenberg received her fees entirely in Zayo stock,[207] which would tend to align her interests in maximizing the deal consideration for all stockholders. *See LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010) (recognizing the view that independent directors who own a "meaningful, long-term common stock stake [is] a useful thing" so as to "align the[ir] interests" with those of common stockholders). Plaintiffs have not alleged facts sufficient to draw a reasonable inference that Rottenberg would lose her director fees if she did not protect Caruso's interests. Caruso owned only 3.6% of

---

[206] *See In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *17 (Del. Ch. Mar. 19, 2018) ("[A]bsent a showing of materiality, the threat of losing director fees is ordinarily not enough to impugn a director's independence."); *In re TriQuint Semiconductor, Inc. S'holders Litig.*, 2014 WL 2700964, at *3 (Del. Ch. June 13, 2014) ("[T]he mere fact that the directors receive fees for their service is not enough to establish an entrenchment motive." (internal quotations omitted)).

[207] *See* Oral Arg. Tr. 95:19–23.

Zayo's stock. Plaintiffs do not allege that Caruso could have removed Rottenberg as a director.

Caruso's other miscellaneous connections with Endeavor and Rottenberg are not sufficient to undermine Rottenberg's ability to fulfill her fiduciary duties to the Company. Caruso's support of Rottenberg's book, his investment in her fund, and his assistance with the Colorado chapter of her organization do not support a reasonable inference that Rottenberg was not independent of Caruso. Plaintiffs have not adequately alleged that Caruso's leadership of the Colorado chapter of Rottenberg's global nonprofit or his donation to the nonprofit are material to Rottenberg. There is no allegation supporting a reasonable inference that Caruso would withdraw his support of Endeavor if Rottenberg voted against the Merger. Plaintiffs have therefore not adequately alleged that Rottenberg is beholden to Caruso or was otherwise incapable of independently evaluating the merits of the Merger.

### 4. White

White joined the Board in 2017.[208] White previously served as a board member of the National Center for Women & Information Technology, a nonprofit based in Boulder. Caruso and Zayo were donors to the nonprofit. White and Caruso were both judges for the Polsky Center's New Venture Challenge.

---

[208] The following facts are alleged in paragraph 20 of the Complaint.

These allegations do not create a reasonable inference that White lacked independence from Caruso.[209]  There are no allegations as to the amount of any donation or when it was made.  Nor are there any allegations that White solicited those donations or how they could have been material to her.  It is not a reasonable inference that Caruso's unspecified donations to a nonprofit on which White served as a board member and their having served as judges at the Polsky Center program rendered her beholden to Caruso or undermine White's ability to independently evaluate the merits of the Merger.

### 5. Gips

Gips joined the Board in 2013.[210]  Caruso has described Gips as a "mentor of sorts."[211]  Gips and Caruso were colleagues during Caruso's tenure from 1998 to 2003 at Level 3 Communications.[212]  Level 3 Communications crashed when the telecom bubble burst, and Caruso was forced to leave.  In 2008, Caruso wrote that

---

[209] Plaintiffs argued that White was not independent at oral argument, but did not make any substantive argument in their briefing that White was not independent.  *See* Pls.' Ans. Br. 41–46 (section detailing Plaintiffs' allegations regarding why five of the six Board members mentioned in the Complaint cannot be independent, absent any discussion of White); *see also id.* 7 (only observing that "White and Caruso both served as judges for the entrepreneurial challenge at Chicago Booth").  The Complaint does not allege when White served as a judge for the New Venture Challenge, whether she and Caruso were judges at the same time, or how their serving as judges for that program rendered White beholden to Caruso or unable to act independently of him.

[210] Compl. ¶ 17.

[211] *Id.*

[212] *Id.*

Gips helped him by introducing him to Columbia Capital, a private equity firm, and that they had stayed in regular contact "from both a social and business standpoint."[213]

These allegations are not sufficient to demonstrate that Gips is not independent from Caruso. They were colleagues 20 years ago and Gips provided Caruso an introduction to a private equity firm. These are the kinds of "[m]ere allegations that they move in the same business and social circles" or "characterization[s] that they are close friends" that the Supreme Court found insufficient to overcome the presumption that directors are independent fiduciaries. *Beam*, 845 A.2d at 1051. Though Caruso has described Gips as a "mentor of sorts,"[214] this rather ambivalent statement does not support a reasonable inference that Gips was beholden to Caruso or that he could not impartially consider the Merger. The Complaint does not plead facts sufficient to impugn Gips's independence.

### 6. Spruill

Spruill joined the Board on November 7, 2018 and was named Lead Independent Director.[215] At the time of his Board appointment, Spruill was CFO of

---

[213] *Id.*

[214] Compl. ¶ 17.

[215] The following facts are alleged in paragraphs 21 and 23 of the Complaint.

SendGrid, Inc., a publicly traded technology company. Prior to working at SendGrid, Spruill was a director of Boulder-based Rally Software. SendGrid received initial funding from Techstars Boulder Accelerator, and SendGrid and Rally Software were both funded by the Foundry Group. In mid-October 2018, SendGrid was sold for approximately $2 billion, and the transaction closed on February 1, 2019. In March 2019, Spruill joined the board of Denver-based Ping Identity Holdings, and in July 2019, Spruill became CEO of Boulder-based DigitalOcean.

Most of these entities have some connection to Caruso: Zayo donates to Techstars, and Caruso is allegedly close to key figures at Techstars and the Foundry Group. SendGrid, Ping Identity, and Techstars are all part of the Blackstone Entrepreneurs Network, where Spruill is a member and Caruso sits on the steering committee. Additionally, Spruill and Caruso live within one mile of each other and are members of the Boulder Country Club.

The alleged connections between Caruso and Spruill's employers are insufficient to undermine Spruill's independence. The various connections that Plaintiff draws between companies affiliated with Caruso and Spruill are too attenuated to support a reasonable inference that Caruso could exert influence over Spruill to the extent that Spruill lacks independence from him.

Plaintiffs allege that the acquisition of SendGrid in 2019 meant that Spruill "likely would be looking for a new tech opportunity in Boulder,"[216] and that Spruill would not oppose a Caruso-friendly buyout "[g]iven Caruso's prominence in the tight world in which Spruill was likely looking for a new position."[217] Plaintiffs analogize this situation to *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018). In *Oracle*, a director had publicly stated that she was trying to become the CEO of a large technology company. *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018). The court ultimately found that the director was not capable of independently evaluating a litigation demand against two Oracle officers, including its cofounder and largest stockholder, Larry Ellison. *Id.* The court reasoned that "[g]iven Oracle's prominence in the technology arena, it is reasonable to infer that [the director's] career ambitions would weigh heavily on her if she were asked to consider suing [the CEO], who continues to wield outsized influence at the company." *Id.* But that was just part of the basis for concluding there was reason to doubt the director's independence. Instead, the court determined that there existed a "constellation of facts that, taken together, create[d] reasonable doubt" about the director's ability to objectively consider a derivative demand to institute litigation. *Id.* Those other facts included that: (1) the director

---

[216] Compl. ¶ 23.

[217] Pls.' Ans. Br. 46.

sat on the boards of two companies that had significant relationships with Oracle; (2) the director publicly stated that "people do what they think the CEO wants, even if they know it's wrong"; (3) the board determined that the director was no longer independent under the NYSE's listing standards; and (4) the director "would face the potential loss of her lucrative directorship if she agreed to sue Ellison." *Id.* In addition, one of the two officers that were the subject of the demand had publicly stated that he was close friends with the director. *Id.*

The allegations as to Spruill come nowhere close to those that influenced the court in *Oracle*. Spruill was a former mergers and acquisitions banker and had most recently been the CFO of a public company.[218] The factual allegations do not create a reasonable inference that Spruill needed Caruso to find new employment, that Caruso had any influence on Spruill's subsequent employment, that Spruill faced the loss of his board seat if he did not vote for the Merger, or that Spruill would not act independently of Caruso. The allegations that Spruill and Caruso live within one mile of each other and are members of the same country club, without more, are the sort of "thin social-circle friendship" allegations that do not support a reasonable inference that a director lacks independence. *Sanchez*, 124 A.3d at 1022. Even considering their social proximity in conjunction with their business connections,

---

[218] Compl. ¶ 23.

the Complaint does not adequately allege that their ties were sufficiently substantial to render Spruill incapable of exercising his independent judgment with respect to the Merger.

\* \* \*

For the foregoing reasons, Plaintiffs have not adequately alleged that a majority of Zayo's nine-member Board was interested, lacked independence from Caruso, or acted in bad faith in approving the Merger. Because the Complaint falls short of disqualifying a majority of the Board, entire fairness is not the applicable standard of review. *Frederick Hsu Living Tr.*, 2017 WL 1437308, at \*26.

## C. The *Revlon* Theory

In the alternative to their entire fairness theory, Plaintiffs allege that Caruso breached his fiduciary duties in connection with the Merger because the Board's process did not satisfy enhanced scrutiny under *Revlon* and its progeny. The Merger was a sale of Company for cash, and it is therefore presumptively subject to enhanced scrutiny under *Revlon*.[219]

Under the *Revlon* standard, a director "must focus on one primary objective— to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end."

---

[219] *In re Mindbody, Inc.,* 2020 WL 5870084, at \*13 ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*").

*RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015) (quoting

*Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1993)).

"Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain

transactions involving a sale of control, it does not eliminate the requirement that

plaintiffs plead sufficient facts to support the underlying claims for a breach of

fiduciary duties in conducting the sale." *Malpiede v. Townson*, 780 A.2d 1075,

1083–84 (Del. 2001). It is well established that "there is no single blueprint that a

board must follow to fulfill its duties, and a court applying *Revlon*'s enhanced

scrutiny must decide whether the directors made a *reasonable* decision, not a *perfect*

decision." *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation

Emps.' Ret. Trust*, 107 A.3d 1049, 1067 (Del. 2014) (internal quotations omitted)

(emphasis in original). *Revlon* thus requires the court to "examine whether a board's

overall course of action was reasonable under the circumstances as a good faith

attempt to secure the highest value reasonably available." *Id.* at 1066 (citing

*Paramount Commc'ns*, 637 A.2d at 41; *Unitrin Inc. v. American Gen. Corp.*, 651

A.2d at 1385–86 (Del. 1995)). The court must assess "the information on which the

directors based their decision" and "the reasonableness of the directors' action in

light of the circumstances then existing." *Paramount Commc'ns*, 637 A.2d at 45.

Proving unreasonable action often requires "evidence of self-interest, undue

favoritism or disdain towards a particular bidder, or a similar non-stockholder-

motivated influence that calls into question the integrity of the process." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del. Ch. 2011).

*Revlon* does not impose a new duty on directors. Fiduciary defendants who are subject to enhanced scrutiny must demonstrate that their "motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Delaware), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007). "The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly." *Del Monte Foods*, 25 A.3d at 830–31. This standard, however, is not a license for a court to substitute a director's judgment with that of its own. *In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *31 (Del. Ch. Mar. 1, 2021).

Plaintiffs frame this as a "paradigmatic *Revlon* claim" where a "conflicted fiduciary . . . tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value" while being "insufficiently checked by the board." *Mindbody*, 2020 WL 5870084, at *13. The Complaint's allegations that Caruso was conflicted does not, alone, require denial of his motion to dismiss. Under Delaware law, "[t]here is nothing inherently wrong with a Board delegating to a conflicted CEO the task of negotiating a transaction." *City of Ft. Myers Gen. Empls.' Pension Fund v. Haley*, 235 A.3d 702, 721 n.69 (Del. 2020). If

57

a board of directors does so, however, Delaware law is concerned with the possibility that the conflicted fiduciary could disable the board's ability to oversee negotiations. Thus, the Delaware Supreme Court has recognized that a plaintiff can state a claim under *Revlon* by pleading that a conflicted fiduciary failed to disclose "critical information" to the board or that the board failed to oversee a conflicted fiduciary sufficiently throughout the sale process. *Kahn v. Stern*, 183 A.3d 715 n.4 (Del. 2018) (TABLE); *Haley*, 235 A.3d at 721 n.69 (Del. 2020); *accord Rudd v. Brown*, 2020 WL 5494526, at *7 n.63 (Del. Ch. Sept. 11, 2020).

Together, *Kahn and Haley* articulate two ways in which a conflicted fiduciary's conduct during transaction negotiations gives rise to a claim for breach of fiduciary duty under *Revlon*. The first circumstance arises where the conflict or other critical information was not adequately disclosed to the Board. This is frequently referred to as a "fraud on the board" claim. For example, in *Mills Acquisition Co. v. Macmillan, Inc.*, the court held that management's financial advisor, in the presence of complicit officers who were on the buy-side of the transaction, misled the board about the bidding process:

> Wasserstein falsely claimed that the advisors had conducted "a level-playing field auction where both parties had equal opportunity to participate." Additionally, in answer to questioning, Wasserstein mistakenly assured the board that he had been the "only conduit of information" during the process and, falsely, that both parties had received *identical* information during the auction. Despite the obvious untruth of these assertions, [two conflicted officers] remained silent, knowing also that Evans had clandestinely, and wrongfully, tipped

58

Maxwell's bid to KKR.

559 A.2d 1261, 1277 (Del. 1989). The Court described the officers' knowing silence about the tip as "a fraud upon the board." *Id*. at 1283; *see also FrontFour Capital Group LLC v. Taube*, 2019 WL 1313408, at *26 ("In the events leading up to the Proposed Transactions, the Taube brothers created an informational vacuum, which they then exploited."). To proceed under that theory, the plaintiff must "allege that [the officer was] acting out of self-interest and [the officer] deceived the rest of the board into approving the transaction." *City of Miami Gen. Emps. and Sanitation Emps. Ret. Trust v. Comstock*, 2016 WL 4464156, at *19 (Del. Ch. Aug. 24, 2016), *aff'd*, 158 A.3d 885 (Del. 2017) (TABLE).

Plaintiffs here, however, concede that they are not asserting a fraud on the board theory.[220] Instead, they contend that Caruso was a conflicted fiduciary in this transaction and there was inadequate board oversight of his conduct. Thus, as the theory goes, the Board did not satisfy its fiduciary duties under *Revlon* and, therefore, Caruso is liable for breach of the duty of loyalty.[221] This claim implicates the second circumstance addressed by *Haley* and *Kahn*. *Haley*, 235 A.3d at 721

---

[220] Oral Arg. Tr. 49:21–50:15, 56:12–14.

[221] This opinion does not address the question of whether a board's failure to properly oversee a conflicted officer during the sale process gives rise to a direct claim against the officer, if the conflict is fully disclosed and the officer does not conceal material information from the board.

n.69. In articulating the standard, the Supreme Court in *Haley* discussed *RBC Capital Markets LLC, v. Jervis*, 129 A.3d at 831, 850–57. *RBC* affirmed this court's findings that the board failed to oversee a special committee appointed to consider a merger proposal, failed to become informed about strategic alternatives and about potential conflicts faced by advisors, and approved the merger without adequate information. *RBC*, 129 A.3d at 831, 850–57. As the Court noted: "While a board may be free to consent to certain conflicts, . . . directors need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest." *Id*. at 855.

Plaintiffs therefore seek to establish their fiduciary duty claim against Caruso through allegations that the Board's management of Caruso did not satisfy enhanced scrutiny. Oral Arg. Tr. 50:7–11 (arguing that "a *Revlon* claim is adequately pled because there was no active board oversight of unreasonable, selfish, self-seeking conduct by a conflicted CEO, and that combination of facts calls into question the integrity of the sale process"). As this court recently observed, however:

> [T]o elevate the standard of review for a paradigmatic *Revlon* claim, an interested officer must be more than overweening; he must be fraudulent or outright manipulative. The board must be more than supine; it must be deceived and permit that deception. And the deception must affect the outcome. To raise the standard of review on any less risks swallowing enhanced scrutiny in every paradigmatic *Revlon* case.

60

*In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at \*34 (Del. Ch. May 6, 2021).

### 1. When did Enhanced Scrutiny Attach?

The parties appear to agree that enhanced scrutiny under *Revlon* was triggered in November 2018, but they disagree as to the precise date. Plaintiffs argue that Caruso triggered the Board's duties under *Revlon* "on or before" November 7, 2018.[222] Plaintiffs contend that Caruso put the Company in play and invited bids when he announced Project Unleash during the November 7 Earnings Call because it "functioned as an active solicitation of bids."[223] Defendant argues that any duties under *Revlon* were not triggered until the Board received a formal proposal from Consortium A on November 16, 2018.[224]

Ordinarily, it is the board that causes the company to initiate an active sale process, thus triggering *Revlon*. There are instances, however, in which "other corporate actors can take action that implicates enhanced scrutiny." *Columbia Pipeline*, 2021 WL 772562, at \*38. For example, in *McMullin v. Beran*, a controlling stockholder's actions in unilaterally initiating, structuring, and negotiating the sale of the company implicated *Revlon*. 765 A.2d 910, 919, 924

---

[222] Pls.' Ans. Br. 30.

[223] *Id.* 31.

[224] Def.'s Opening Br. 39.

(Del. 2000). In *RBC*, the Court agreed with this court's determination that the initiation of the sale process occurred when the Chief Executive Officer, who chaired a special committee charged with considering strategic alternatives, retained an investment bank which believed that its charge was to sell the company. Several months later, the board adopted resolutions stating that it ratified any and all actions taken by the special committee. The Supreme Court held that "these unusual facts" supported this court's factual finding that *Revlon* was triggered before the board authorized selling the company. *RBC*, 129 A.3d at 852–53. In doing so, however, the Supreme Court did not depart from its decision in *Lyondell Chem. Co. v. Ryan*, where it concluded that "[t]he time for action under *Revlon* did not begin until . . . the directors began negotiating the sale of Lyondell." 970 A.2d, 235, 242 (Del. 2009); *see RBC*, 129 A.3d at 852.

Plaintiffs also rely on *Columbia Pipeline*. In that case, the court held that it was reasonably conceivable that *Revlon* was triggered when the company's chief financial officer, without board authorization: (1) emailed 190 pages of confidential documents to an officer of the acquiror; (2) handed him talking points on how the acquiror could convince the target board to agree to a deal without putting the target in play, thus avoiding a competitive auction; (3) told him that the acquiror would be unlikely to face competition because the target had eliminated the competition; and (4) invited a bid. 2021 WL 772562, at *6–7, 39.

The allegations of the Complaint do not create a reasonably conceivable inference that Caruso's conduct on November 7, 2018 triggered enhanced scrutiny. Even if Caruso's combined earnings and Project Unleash announcement put Zayo "in play" as Plaintiffs allege, that does not trigger *Revlon*. *See RBC*, 129 A.3d at 852 (reiterating that "enhanced scrutiny did not arise simply because the company was in play") (cleaned up) (quoting *Lyondell*, 970 A.2d at 242). Caruso did not disclose confidential corporate information designed to give a bidder a competitive advantage in acquiring the company as was the case in *Columbia Pipeline*. Nor did he time, structure, and negotiate the entire transaction with a favored bidder as in *McMullin*. And there are no unusual facts such as in *RBC* where the board ratified prior conduct. Instead, the allegations establish a pleadings-stage inference that *Revlon* was not triggered until November 16, 2018 at the earliest, when the Board received the first indication of interest from Consortium A. Nevertheless, even assuming that enhanced scrutiny applies to all events on and after November 7, 2018, the result is the same.

### 2. Caruso Did Not Breach His Fiduciary Duties Under *Revlon*.

Plaintiffs' Complaint does not state a claim that Caruso breached his fiduciary duties due to a failure of the Board to oversee him as a purportedly conflicted fiduciary. As discussed above, a majority of Zayo's Board was disinterested and independent from Caruso. Zayo's Board therefore had no incentive to fail to oversee

63

Caruso. Plaintiff does not dispute that Zayo's Board was fully informed of Caruso's purported conflicts of interest. It is not disputed that the Board confirmed that there were no unauthorized discussions regarding whether Caruso would continue with the Company after the transaction.[225] It is also undisputed that Zayo's Board, with the assistance of financial and legal advisors, conducted a six-month public sales process, accepted the highest price offered by any bidder, and negotiated a termination fee of approximately 2.5% of equity value to permit the emergence of a superior offer for the ten months between signing and closing. *See C & J Energy Servs.*, 107 A.3d at 1067 (holding that *Revlon* "permit[s] a board to pursue the transaction it reasonably views as most valuable to stockholders, so long as the transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so.").

Cast against this background, Plaintiffs' claim that the Board failed to manage Caruso's conduct is distillable to a few primary events that, according to Plaintiffs, unreasonably caused the Company to be sold to Consortium B at less than the highest available price. According to Plaintiffs, Caruso breached his duties by ignoring the advice of his CFO and JPM regarding the order of presentations on the November 7 Earnings Call, causing the Company to enter into contingency fee arrangements with

---

[225] *See, e.g.*, Proxy at 48, 49.

64

JPM and GS, and by informing Ganzi that Zayo's Board would be willing to engage at $35 per share.

For the following reasons, these specific events do not amount to a claim that Caruso breached his fiduciary duties. Nor do they create a reasonable inference that the Board failed to oversee Caruso during the sale process in a manner that rendered it unreasonable or that Caruso disabled the Board to further his own self-interests.

### 3. November 7 Earnings Call

Plaintiffs take issue with Caruso's organization of the November 7 Earnings Call. JPM suggested that he begin the call with the announcement of Project Unleash and to follow that announcement with news of the disappointing earnings.[226] JPM advised Steinfort, Zayo's CFO, that "a few precedent joint spin/earnings announcements" indicated that strategic spin-off announcements preceded the earnings review or were standalone events.[227] Steinfort forwarded JPM's email to Caruso and agreed with JPM's suggestion because, otherwise, analysts might be "impatient" with Caruso "going through results waiting for you to get to strategic part."[228] Caruso, however, chose to lead with a summary of the earnings results before introducing Project Unleash, telling Steinfort: "keep summary slide in place,

---

[226] Compl. ¶ 72.

[227] Id.

[228] Id. ¶ 73.

then I go through Unleash."[229]  Caruso ultimately began the call with the news that

Zayo had missed its earnings by 4% to 6%,[230] its second quarterly miss in a row.

Zayo's stock price fell over 25% following the call.[231]  Plaintiffs surmise that Caruso

rejected JPM's and Steinfort's advice with the purpose of dropping the stock price

and facilitating the Merger.  Plaintiffs argue that, "not coincidentally," the

disappointing earnings call got positive feedback from private equity bidders.[232]

Plaintiffs allege that "Zayo was soon in play."[233]

Under some situations, a fiduciary may breach his fiduciary duty by using

public announcements to manipulate the company's stock price, thereby driving the

company towards a sale.  In *Mindbody*, after receiving an indication of interest from

his preferred acquiror, the company's CEO sought "a creative way" to guide

expectations on an upcoming earnings call, and lowered revenue guidance by $1 to

$3 million.  *Mindbody*, 2020 WL 5870084, at *20–21.  The CEO made the

announcement in spite of management's internal sentiment that the company was on

track to hit its forecasts, which turned out to be correct.  *Id.* at *20.  The court in

---

[229] *Id.* ¶ 74.

[230] *Id.* ¶ 76.

[231] *Id.* ¶ 78.

[232] Pls.' Ans. Br. 37.

[233] Compl. ¶ 81.

*Mindbody* found that it was reasonably conceivable that the CEO "provided lower guidance for reasons unrelated to business expectations." *Id.*

The Complaint here does not allege facts sufficient to support a reasonable inference that Caruso breached his fiduciary duties through the November 7 Earnings Call. Plaintiffs do not allege that Caruso knowingly presented inaccurate information or that Project Unleash was a sham designed to generate acquisition interest.[234] Instead, Plaintiffs argue that Caruso structured the November 7 Earnings Call in a manner designed to tank the stock price and generate private equity interest in acquiring Zayo. That argument is too speculative to credit. It is not a reasonable inference that the order of Caruso's presentation caused a decline in Zayo's stock price more than if he had presented the information in a different order. It is likewise not a reasonable inference that the order of Caruso's presentation generated more acquisition interest than if he had organized his presentation differently, or even if he had done so on separate days. It is therefore not a reasonable inference that Caruso engineered the order of the presentation to generate private equity interest.

This case is not like *Mindbody*. Plaintiff does not argue that the substance of Caruso's presentation on November 7 contained any element of deceit. The November 7 Earnings Call is not analogous to the announcement in *Mindbody*

---

[234] *See* Compl. ¶¶ 71–80.

because, in *Mindbody*, the court could reasonably infer that a conflicted CEO who lowers earnings guidance in spite of more optimistic internal projections intentionally caused the company's stock price to fall. Merely changing the order of a presentation cannot reasonably be inferred to have the same effect. And even assuming enhanced scrutiny attached at this date, it strains credulity to suggest that the Board should have micromanaged the order of Caruso's presentation.

### 4. Contingency Fees

Plaintiffs argue that Caruso "caused Zayo to retain financial advisors on terms that assumed a sale of the Company."[235] Plaintiffs take issue with the financial terms of the engagement letters with GS and JPM because they have contingency payments. The engagement letters provided that GS and JPM would earn $27.2 million if Zayo sold for $33 per share, and they would earn more if Zayo sold at a higher price.[236]

Plaintiff has not alleged that Caruso caused the Company to enter into the engagements with GS and JPM pertaining to a possible sale of the Company.[237] The Complaint alleges that "Zayo management sought Board approval of the financial

---

[235] Pls.' Ans. Br. 2.

[236] Compl. ¶ 98.

[237] GS and JPM had been performing investment banking advisory services for the Company prior to the sale process. *See id.* ¶ 46.

terms of the Company's engagement of GS and JPM."[238] The Board approved those terms at a subsequent meeting.[239] There is nothing inherently wrongful about the contingency fee arrangement at issue in this action.[240] *See In re Alloy, Inc.*, 2011 WL 4863716, at \*11 (Del. Ch. Oct. 13, 2011) (observing that contingent fees are routine, "reduce the target's expense if a deal is not completed," and may "incentivize the financial advisor to focus on the appropriate outcome") (internal citations omitted). There is no allegation that Caruso circumvented the Board or

---

[238] *Id.* ¶ 98.

[239] Ex. 25.

[240] Plaintiffs cite to a list of cases for the proposition that "Delaware law recognizes the corrupting incentives created by contingent financial advisory fees." Pls.' Ans. Br. 39; *id.* n.5. But each of those cited cases does not stand for this general proposition on its own and either discussed contingency fees in a different context to that of a *Revlon* claim or was accompanied by a distinguishable set of facts. Here, there are no allegations that JPM or GS manipulated the inputs of their analyses to "make the price . . . look fair." *See In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2015 WL 1815846, at \*24 (Del. Ch. Apr. 20, 2015) (finding multiple instances where the financial advisor "manipulated" the inputs used in its analysis). Nor was this a transaction where the financial advisors' contingency fees were structured on an all-or-nothing basis, so that they were only paid if the Merger was approved. Proxy at 62 ("[f]or services rendered . . . the Company [] agreed to pay [JPM] . . . approximately \$30,000,000, \$3 million of which was payable following delivery of [JPM's] opinion and the remainder of which [was] contingent . . . upon consummation of the transaction[]"), 68 (same for GS); *see In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 442 (Del. Ch. 2012) (discussing how financial advisor's advice was "more questionable" based on \$35 million or nothing contingency fee); *see also In re Tele-Commun., Inc. S'holders Litig.*, 2005 WL 3642727, at \*10 (Del. Ch. Dec. 21, 2005) (significantly higher contingency fee for financial advisor of \$40 million in 1999). This is also not a question of materiality for an alleged disclosure violation. *See IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at \*20 (Del. Ch. Dec. 11, 2017) (implying that in the disclosure context, contingency is likely necessary, but not sufficient, in order for the failure to disclose a financial advisor's fee to constitute a material omission).

unilaterally acted to influence the bankers in a way that would taint the sales process. Nor is there any allegation that GS or JPM concealed any information from or misled the Board.

### 5. The Alleged Tip to Ganzi

Plaintiffs allege that Caruso tilted the sales process towards a management-friendly buyout, and a buyout with Ganzi in particular, when he conveyed to Ganzi the price at which Consortium B could obtain exclusivity. In a conversation between Caruso and Ganzi on February 11, 2019, Ganzi indicated that Consortium B had "price enthusiasm in the $34-36 range."[241] Caruso replied that he "can't speak for board on price, but that they've shown willingness to engage at $35+ but not willingness at lower prices."[242] Earlier that day, the Company's bankers and the Board's Lead Independent Director had instructed Caruso to tell Consortium A that the Board would not accept a bid below $35, but the instruction regarding Consortium B was simply that Caruso should encourage Consortium B to re-engage.[243]

Caruso's discussion with Ganzi regarding the price at which the Company would "engage" is distinguishable from the cases that Plaintiffs invoke concerning

---

[241] Compl. ¶ 130.

[242] *Id.*; Ex. 33.

[243] Ex. 34.

a faithless "tip" to serve a fiduciary's own self-interests. In *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, the board's financial advisor tipped a financial buyer about the details of a competing strategic buyer's bid, including price, and did not disclose it to the board. 251 A.3d 212 (Del. Ch. 2021). The tip led the financial buyer to outbid the strategic bidder by a dime, impose a short deadline to respond, and demand an increased termination fee. The tip brought the sale process to an end. The court concluded that concealment of the tip from the board precluded efforts to neutralize the tip and facilitate an active bidding contest. *Id.* at 269. Further influencing the result in that case was the target CEO's agreement to post-acquisition employment with the financial buyer and an agreement to roll over more than half of his equity into equity in the acquired company. This made the CEO a "net buyer," thus aligning his interest with that of the acquiror to "pay[] as little as possible." *Id.* at 268 n.14.

Vice Chancellor Laster found the tip in *Presidio* to be similar to that in *Macmillan*, where members of company management tipped KKR, one of the participants in the sale process, by providing the specific price of a competing bidder's offer. *Id.* at 268–69. KKR then used that information to formulate its next bid and to demand additional protections. As in *Presidio*, the tip to KKR had been

withheld from the target board, and the two executives that tipped KKR were participants in the buyout.[244]

Unlike in *Macmillan*, Consortium B was not tipped as to "every crucial element of [Consortium A's] bid." 559 A.2d at 1283. There is no allegation that Caruso told Consortium B any details of Consortium A's bid, which at the time of that communication on February 11, 2019, was $31.50. Plaintiffs contend that Caruso should have told Ganzi that the Board would be disinclined to accept anything below its prior anticipated range of $36–$38.[245] Perhaps so, but that is merely a disagreement over tactics. The Board wanted Consortium B to re-engage and create a competitive sale process. Unlike in *Presidio* and *Macmillan*, it was not the type of information that revealed a competing bidder's price or other deal terms and there is no allegation that it led Consortium B to make a short-fuse offer or propose onerous deal protections that would place any other bidder at a material disadvantage. When Consortium B submitted its indication of interest at $35 per share and sought exclusivity, the Board agreed, but it also extracted Consortium B's

---

[244] *Mills Acq. Co. v. Macmillan, Inc.*, 1988 WL 108332, at *5 (Del. Ch. Oct. 18, 1988) ("Under KKR's bid, several of Macmillan's senior managers would be offered the opportunity to acquire 20% of the equity of the KKR-controlled entity that was to serve as the acquisition vehicle."); *id*. at *8 n.13 (indicating that the two Macmillan executives "and other members of senior management would be equity owners in the new KKR-controlled company").

[245] Pls.' Ans. Br. 40.

commitment that any extension of exclusivity would be conditioned on not lowering its $35 price.

Furthermore, unlike in *Presidio* and *Macmillan*, there is no allegation that Caruso concealed any information from the Board. *Cf. Presidio*, 251 A.3d at 269 ("It is reasonable to infer that by not telling the Board about its tip to BCP, LionTree prevented the Board from taking action to neutralize the effect of the tip and facilitate an active bidding contest."); *Macmillan*, 559 A.2d at 1279 ("Given th[e] finding [that the two management directors were participants in the buyout, their] deliberate concealment of material information from the Macmillan board must necessarily have been motivated by an interest adverse to Macmillan's shareholders."). As Plaintiffs acknowledged, Caruso informed Spruill, Steinfort, and the bankers the following day of his conversation with Ganzi. There is, therefore, no reasonable inference that Caruso was covertly seeking to tilt the bidding process in favor of Consortium B by disclosing the lowest price that the Board would be willing to accept.

It is also not reasonable to infer that Caruso's discussion with Ganzi effectively ended the sales process. At oral argument, Plaintiffs' counsel argued that Caruso's discussion with Ganzi ended price negotiations, claiming that as a result of the discussion, "any other options have been taken out of the board's hands. It's just yes or no, 35, because that's the magic number that Caruso told Consortium B, and

73

that's—that's the only bid in town."[246]  This argument fails because Zayo's Board remained free to continue to negotiate with Consortium B, including by rejecting an offer for $35 per share.  There is no allegation that Consortium B had delivered an offer that would be withdrawn if not accepted in an inordinately short period.  *Cf. Macmillan*, 559 A.2d at 1269.  There is no well-pleaded allegation indicating that Caruso disabled the Board in any fashion through the February 11 conversation, including by bringing an active bidding process to a close.  To the contrary, Consortium A remained interested up until the signing of the Merger Agreement, but did not submit a higher offer.[247]  There is also no allegation supporting a reasonable inference that Caruso put off any bidder willing to offer a higher price in favor of Consortium B.  *See In re Netsmart Tech., Inc. S'holders Litig.*, 924 A.2d 171, 194 (Del. Ch. 2007) ("There is no evidence in the record that any bidder was ever put off the hunt by Conway because of his self-interest.").

Because the Board was fully informed and remained free to act, I cannot reasonably infer that Caruso's discussion with Ganzi constituted a breach of his obligation to "secure the transaction offering the best value reasonably available for the stockholders," *RBC*, 129 A.3d at 849, or that the Board failed to oversee his conduct.  The Complaint does not allege facts from which it is reasonably

---

[246] Oral Arg. Tr. 82:15–19.

[247] *See* Proxy at 48–52.

74

conceivable that the Board demonstrated self-interest, undue favoritism, or disdain toward a particular bidder or that it harbored a "non-stockholder-motivated influence that calls into question the integrity of the process." *Del Monte Foods*, 25 A.3d at 831. Therefore, the Complaint does not allege facts to support a breach of fiduciary duty claim based on a failure of the Board to oversee Caruso's conduct during the sale process.

### D. Disclosure Claims

The Complaint alleges that Caruso breached his fiduciary duty in his capacity as an officer by approving a materially misleading Proxy. "'Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control.'" *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *12 (Del. Ch. Oct. 27, 2020) (quoting *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017)); *accord City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *18. The Delaware Supreme Court has explicitly held that "corporate officers owe fiduciary duties that are identical to those owed by corporate directors." *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009). Thus, corporate officers may breach their fiduciary duties to the extent they are involved in preparing a proxy statement that contains materially misleading disclosures or omissions. *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *11 (Del. Ch. June 18, 2018) (holding that a

complaint stated a claim against an officer for violation of the fiduciary duty of disclosure and noting that directors and officers of a corporation generally owe the same fiduciary duties); *see also Baker Hughes*, 2020 WL 6281427, at *15–16; *Roche*, 2020 WL 7023896, at *18; *Morrison v. Berry*, 2019 WL 7369431, at *25, *27 (Del. 2018).

Caruso was Zayo's CEO during the sale process and played an integral role during the Merger negotiations.[187] The Complaint alleges that Caruso signed the Proxy in his capacity as Zayo's CEO.[248] *See Roche*, 2020 WL 7023896, at *18 (holding CEO could be liable for breach of the duty of care for a misleading proxy disclosure where he was involved in the negotiation of the merger and signed the proxy); *Baker Hughes*, 2020 WL 6281427, at *15–16 (same); *Hansen Med.*, 2018 WL 3025525, at *11 ("Vance affixed his signature to the Proxy in his capacity as President and CEO and presented the information to the stockholders for their consideration. This means he may be liable for material misstatements in the Proxy in his capacity as an officer [and] as a director."). Therefore, the Complaint alleges facts from which it can reasonably be inferred that Caruso was involved in preparing the disclosures in the Proxy in his capacity as an officer of Zayo.

In a request for stockholder action, directors have a duty to disclose fully and

---

[248] Compl. ¶155.

fairly all material facts within their control bearing on the request. *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989). A corporate fiduciary may violate a duty of disclosure if she "mak[es] a materially false statement," "omit[s] a material fact," or "mak[es] a partial disclosure that is materially misleading." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotations omitted). "To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials." *Id.* at 686. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotations omitted). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 944 (quoting *TSC Indus.*, 426 U.S. at 449).

### 1. Stockholder Activism

With respect to stockholder activism, the Proxy discloses that: Company representatives met with activist stockholders, two of which "encouraged the Company to consider strategic alternatives";[249] the Board discussed "recent activist

---

[249] Proxy at 33.

[] activity" and how to "engag[e] with activist[s]";[250] Caruso was concerned that Consortium A was having conversations with activists, in part, to pressure the Board;[251] and the Company received multiple letters from activists[252]. Plaintiffs assert that this disclosure omitted material information. Plaintiffs argue that the Proxy should have stated that it was likely that a proxy contest would be brought by activist stockholders if Zayo was not sold.[253] Plaintiffs point to Sachem Head's January 25, 2019 letter to the Board and Senator's January 31, 2019 email to Caruso, both urging the Board to accept a reasonable bid.[254] In support of their argument, Plaintiffs point to *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677 (Del. Ch. Dec. 10, 2018), which involved an activist stockholder's threat to replace an officer. In *Xura*, the CEO "knew that both the Board and stockholder activists were displeased with his performance and likely would remove him from office if a sale of the Company did not occur." *Id.* at *13. In *Xura*, "[m]ajor stockholders . . . openly questioned" the CEO's performance. *Id.* at *8. These threats were concrete: in *Xura*, the stockholder plaintiff had declared that it "intended to launch a proxy contest" and "made clear to both [the CEO] and the Board its view that Xura should find a

---

[250] *Id.* at 37, 41.

[251] *Id.* at 38.

[252] *Id.* at 40, 44.

[253] Pls.' Ans. Br. 49.

[254] *Id.* at 49–50; Ex. 28; Compl. ¶ 90.

new CEO." *Id.* The Chairman of Xura "privately advised [the CEO] that the Board was considering major changes if there was no deal, including changes at . . . the highest ranks of management." *Id.*

The letter from Sachem Head to the Board states that proxy action would be one of many options available to stockholders, if the Board rejected a credible bid for Zayo (*i.e.*, in the "low-to-mid 30s"): "If the Board rejects such an offer . . . , shareholders will be forced to consider any and all options (including proxy action) to preserve the value of their investment."[255] Senator's email is also less specific than the communications in *Xura*. Senator's email states: "In our view, a decision not to accept a reasonable offer will likely result in shareholder actions to replace senior management if execution doesn't improve quickly."[256] The Sachem Head letter and Senator email are far more general than the concrete threats in *Xura*, and they were not backed by the Board, as was the case in *Xura*. As noted above, the Proxy recounts external meetings and communications that Zayo had with activist

---

[255] Ex. 28 at 3.

[256] Compl. ¶ 90.

stockholders,[257] internal discussions regarding activists,[258] and communications with potential buyers concerning activist stockholders.[259] These disclosures were not materially misleading and did not reflect material omissions about the activist pressures confronting Zayo.

## 2. Directors' Independence

The Proxy refers to the directors on Zayo's Board other than Caruso as the "Company's independent directors." Plaintiffs contend that the Proxy was, therefore, "materially misleading if any of the outside directors [were] not independent."[260] Plaintiffs further argue that the Proxy should have disclosed any potential conflict of interest for each of Zayo's directors.[261] Plaintiffs' argument is based on a flawed reading of the Proxy. In its first reference to the "independent

---

[257] Proxy at 33 ("Mr. Caruso and the Company's representatives met with certain activist stockholders."), 40 ("the Company received a letter from an activist shareholder" and another letter from a "second activist shareholder"), 44 ("the activist shareholder, Starboard Value, released a public letter urging the Company to sell").

[258] *Id.* at 37 ("The board of directors also discussed recent activist shareholder activity."), 41 ("a representative of Skadden discussed with the board of directors potential approaches to engaging with activist stockholders").

[259] *Id.* at 38 (Caruso indicating to a bidder's representative that "he was concerned that . . . conversations with shareholder activists . . . were part of an effort to lower the price and put pressure on the board of directors"), 41 ("representatives of Skadden, [JPM] and [GS] had a call with representatives of Consortium A to convey the board of directors' message that leaks . . . to activist stockholders were unacceptable"), 42 (Caruso noting to a representative of Consortium A that "the Company would have to defend itself if leaks and related activist pressure ended up causing the Company further damage").

[260] Pls.' Ans. Br. 52.

[261] *Id.* at 52–53.

directors," the Proxy states that, "during a meeting of all of the directors of the board of directors other than Mr. Caruso, *whom we refer to* as the Company's independent directors, Phil Canfield voluntarily resigned from the board of directors."[262]

The references to the directors other than Caruso as the "Company's independent directors" in the Proxy are not materially misleading. In context, the reference to the "Company's independent directors" refers to the directors other than Caruso—*i.e.,* the Company's outside directors. Plaintiffs complain that use of the defined term "independent" is misleading because certain directors had relationships with Caruso, but as the term is used in the Proxy, a reasonable stockholder would not assume that an "independent" director would be "independent" from Caruso. The Proxy clearly and unambiguously uses the term "independent" to define non-employee or outside directors.

### 3. Caruso's Conversations with Ganzi

Plaintiffs contend that the Proxy did not disclose two significant exchanges between Caruso and Ganzi. Those communications occurred on February 11, 2019 and October 19, 2018.

### i. The February 11 Discussion

Plaintiffs argue that the Proxy should have disclosed Ganzi's February 11, 2019 statement to Caruso that Consortium B had "price enthusiasm" in the range of

---

[262] Proxy at 29 (emphasis added).

$34–$36 per share and Caruso's response that, while he could not speak for the Board on price, the Board had "shown willingness to engage at $35+ but not willingness at lower prices."[263]  Plaintiffs argue that failing to disclose this information was an improper partial disclosure.  According to Plaintiffs, because the Proxy discloses that Consortium B provided an indication of interest for $36 to $38 per share on December 16, 2018,[264] and that Ganzi provided an oral indication of interest at $35 per share on February 20, 2019,[265] it was necessary to disclose the February 11 discussion.

"Once defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).  Thus, "the disclosure of even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).  The Proxy contains a thorough recounting of the negotiation process, but it omits Ganzi's price enthusiasm in the $34 to $36 range

---

[263] Compl. ¶¶ 130, 151; Ex. 33 (email chain from Caruso recounting call with Ganzi to Spruill and others dated February 11, 2019).
[264] Proxy at 35.
[265] *Id.* at 42.

and Caruso's suggestion to Ganzi that the Board was only willing to engage at "$35+."[266] Having partially disclosed the negotiation history between Consortium B and Zayo, including Consortium B's first indication of interest at $36–$38 and Ganzi's $35 offer on February 20, a disclosure of the pricing discussion on February 11 was necessary to provide an "accurate, full, and fair characterization of those historic events" to stockholders. *See Morrison*, 191 A.3d at 283 (quoting *Arnold*, 650 A.2d at 1280). Without that information, Zayo's stockholders did not know that Caruso's statement to Ganzi that the Board had shown "willingness to engage at $35+" became the price that Consortium B offered on February 20 and that Ganzi had communicated a price range up to $36 shortly before February 20 to Caruso. It is reasonably conceivable that this information would have "altered the 'total mix' of information available" to a reasonable stockholder, and it would have been important to a reasonable stockholder when voting on the Merger.

Caruso was directly involved in that exchange with Ganzi and documented it twice in emails to the Company's financial advisors and the lead independent director. He also signed the transmittal letter for the Proxy. Under these facts, the Complaint alleges a claim that Caruso breached his duty as an officer, which is not subject to exculpation.

---

[266] *See* Ex. 33.

83

## ii. The October 19 Discussion

Plaintiffs claim that it was materially misleading for the Proxy to exclude the conversation that Caruso had with Ganzi on October 19, when Ganzi expressed that his approach to take Zayo private "required" that Caruso agree to be CEO.[267] The Proxy is not materially misleading in this respect. The Proxy discloses a conversation between the Board and Caruso the same day, where Caruso reminded the Board of Ganzi's indication of interest in acquiring Zayo "*and* partnering with the Company's current management team."[268] The Proxy does not use the word "require," but the Proxy discloses that Ganzi's interest in an acquisition was coupled with his desire to work with Zayo's management post-acquisition. As important, on three later occasions, the Proxy discloses that Ganzi or Consortium B indicated to Caruso or the Board that management's continuing involvement would be necessary if their bid was selected. The Proxy discloses that: (1) on February 12, Ganzi told Caruso that the "continuing involvement of the Company's management team would be expected,"[269] (2) on March 28, Ganzi told Caruso and a representative from GS that Consortium B "needed to partner with management to ensure that there was a capable management team in place following the acquisition,"[270] and (3) on May 3,

---

[267] Compl. ¶ 154.

[268] Proxy at 27 (emphasis added).

[269] *Id.* at 41.

[270] *Id.* at 45.

Consortium B's confirmation letter to the Board stated that "in order to finalize the arrangements around the Company's acquisition" it was "requesting permission to discuss the terms of management's continued investment in the Company and post-closing management equity incentive arrangements" with Caruso and senior management[271]. Taken together, these disclosures would have apprised a reasonable stockholder that from the outset Ganzi and Consortium B sought to work with Caruso and senior management of Zayo post-closing.

### 4. Valuations of Strategic Alternatives

Plaintiffs contend that there were three sets of valuation facts that the Proxy should have disclosed: (1) in April 2019, Zayo management believed the Network business would be worth $27–$36 per share by the end of 2019; (2) Zayo received an offer to buy the Colocation business with a range as high as $8 per share; and (3) Zayo management had previously made a "detailed assessment" that Zayo was worth $48.19 per share on a sum-of-the-parts basis when it was considering Project Unleash.[272]

The Proxy disclosed alternatives that the Board considered, including Project Unleash[273] and a sale of the Company's Colocation business[274]. Zayo disclosed to

---

[271] *Id.* at 49.

[272] Compl. ¶¶ 152–53.

[273] *E.g.*, Proxy at 27–28. The Proxy refers to Project Unleash as the "Separation."

[274] *Id.* at 36.

stockholders more than once that it had considered alternatives to a sale of the entire Company,[275] and it was not required to provide valuations for Project Unleash. A board is not required to disclose "the panoply of possible alternatives to the course of action it is proposing." *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009); *see also Neustadt v. INX, Inc.*, C.A. No. 7017-VCG, at 30–31 (Del. Ch. Dec. 16, 2011) (TRANSCRIPT) (declining to require disclosure of "details of transactions that might have been"). Even if Zayo had continued to pursue Project Unleash, "Delaware courts repeatedly have held that management's failure to inform stockholders of other strategic alternatives it was considering at the time of the transaction in question is not a breach of fiduciary duty." *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *14 (Del. Ch. Dec. 11, 2017). In *IRA Trust*, after a stockholder vote approving of a reclassification of shares, the plaintiffs alleged that the proxy statement should have disclosed alternatives that were previously presented to the company's board of directors. *Id.* at *13. There, in ruling that there was no disclosure violation, the court reasoned that it was the responsibility of the board of directors to weigh possible alternatives, not that of the stockholders, who were only asked to consider the merits of the reclassification. *Id.* at *14. As in *IRA Trust*, Zayo's stockholders were not being asked to consider

---

[275] *E.g.*, *id.* at 33, 34, 42.

Project Unleash as an alternative to the Merger; they were just asked to vote on the Merger.

The Proxy was also not required to disclose the granular and additive details that Plaintiffs seek to require. *See 3Com*, 2009 WL 5173804, at *6; *see also In re OPENLANE, Inc.*, 2011 WL 4599662, at *12 (Del. Ch. Sept. 30, 2011) (rejecting the need for a "play-by-play" disclosure regarding negotiations (internal quotations omitted)). The Proxy describes numerous analyses from JPM and GS. As an example, the Proxy discloses that JPM conducted a discounted cash flow analysis indicating an implied per share equity value range from $32 to $51, which encompasses the sum-of-the-parts value that Plaintiffs argue should have been disclosed.[276] Plaintiffs do not dispute that the Proxy fairly and accurately described the valuation analyses that GS and JPM presented to the Zayo Board and the projections upon which those analyses relied. In *3Com*, the plaintiffs argued that a proxy statement for a merger should have disclosed the value of the company's "three distinct operating segments." 2009 WL 5173804, at *5. The court held that this disclosure was unnecessary because the plaintiffs had not alleged that the acquiror used information regarding the separate operating segments while developing its bid. *Id.* Here, like in *3Com*, Plaintiffs have not alleged that Ganzi or

---

[276] Proxy at 60. JPM also provided a valuation of $27.25–$48.25 per share, *id.* at 62, while GS provided a valuation at $30.18–$51.47 per share, *id.* at 67.

Consortium B utilized a sum-of-the-parts analysis in formulating their bid. Instead, they allege that Caruso "guided" Consortium B to its bid.[277] "So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment." *Id.* at *1.

Plaintiffs rely on *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510 (Del. Ch. Apr. 6, 1992), but *Gilmartin* is readily distinguishable. In *Gilmartin*, this court held that a proxy statement that omitted the misgivings of two board members regarding the timing of the sale of a company was materially misleading. *Gilmartin*, 1992 WL 71510, at *11. There, the proxy statement only stated that the board members unanimously recommended that the stockholders vote for the merger and that the board believed that the terms of the merger were in the best interests of the company and its stockholders. *Id.* The court reasoned that the proxy statement gave the inaccurate impression that each board member believed that this was an appropriate time for a sale. *Id.* Like in *Gilmartin*, this merger was approved by a unanimous board vote. But unlike in *Gilmartin*, Plaintiffs have not alleged that there were any members of Zayo's Board or its management who expressed any reservations about the Merger. There are no well-pleaded allegations that any directors or officers of

---

[277] Pls.' Ans. Br. 47; *see also* Compl. ¶¶ 130–32, 151; Pls.' Ans. Br. 40 (suggesting that Consortium B's bid was a product of Caruso's February 11 conversation with Ganzi).

Zayo subjectively believed that it was not a good time to sell the Company. This case is not similar to *Gilmartin*, and Plaintiffs' arguments that additional valuation information should have been disclosed fail.

* * *

Caruso argues that the motion to dismiss must be granted under *Corwin v. KKR Financial Holdings. LLC*, 125 A.3d 304, 312–14 (Del. 2015), because the Merger was approved by a fully informed, uncoerced vote of disinterested stockholders. As discussed above, Plaintiffs have stated a claim that the Proxy contained a material omission regarding the February 11 discussion between Ganzi and Caruso. Caruso therefore has not established that the stockholder vote approving the Merger was fully informed. Accordingly, the Complaint is not subject to dismissal under the business judgment rule as a result of the stockholder vote approving the Merger. *Corwin*, 125 A.3d at 312 ("the doctrine applies only to fully informed, uncoerced stockholder votes"); *accord Baker Hughes*, 2020 WL 6281427, at *14.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part.

**IT IS SO ORDERED.**

89